Carol Ann Olson, a Minor, by Richard I. Olson, her Father and Next Friend, Plaintiff-Appellee, v. Chicago Transit Authority, a Municipal Corporation, Defendant-Appellant.

Gen. No. 45,458.

Opinion filed February 4, 1952. Rehearing denied March 25, 1952. Released for publication March 25, 1952.

THOMAS C. STRACHAN, JR., JAMES O. DWIGHT, FRED J. O'CONNOR, ARTHUR J. DONOVAN, and WERNER W. SCHROEDER, all of Chicago, for appellant; JAMES E. HASTINGS, of Chicago, of counsel.

JAMES A. DOOLEY, of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Carol Ann Olson, a minor, by her next friend, filed an amended complaint in the superior court of Cook county against the trustees of the corporation operating as Chicago Surface Lines, charging that on May 12, 1943, at Chicago, she was seriously and permanently injured because of the negligence of the defendants, by their servants, in the operation of a streetcar. Issue was joined. A trial resulted in a verdict in favor of plaintiff for $75,000. Motions for a new trial and for judgment notwithstanding the verdict were denied and judgment was entered on the verdict. Chicago Transit Authority, which assumed the liability of Chicago Surface Lines, defended the case in the trial court and appeals. On the trial defendant contested its liability and the damages. In this court it concedes that the motorman's negligence was properly a question of fact for the jury and does not argue the question of liability. Plaintiff's theory is that defendant's negligence was the proximate cause of her condition of ill-

48

being. Defendant's theory is that the damages awarded are grossly excessive, that the verdict included damages for an operation performed solely to correct a congenital condition, that this special damage claim was not alleged in the complaint, that there can be no recovery for aggravation of a congenital condition because such special damage was not alleged in the complaint, and that the court erred in excluding certain expert medical testimony.

Carol Ann Olson, the plaintiff, was born on December 11, 1938. Her father operated a blind and shade business at 4416 North Clark street, a highway running in a northerly and southerly direction and on which defendant's predecessor operated streetcars. On May 12, 1943, at about 5:20 p. m., plaintiff, who attended a nursery school, was being returned to her parents at the store. She was in a station wagon facing in a southerly direction on Clark street in front of the store. A southbound streetcar struck the station wagon from behind while she was in the act of alighting. She was thrown into the air and onto the pavement. Her father, who was looking out of the store window, ran out, picked her up and brought her into the store. She was unconscious, which condition lasted from 15 to 20 minutes. Plaintiff's mother who was in the store said that Carol Ann had a swelling the size of an egg on the right frontal area above the eye. It was turning color but there was no outside bleeding. There was a similar swelling on the back or occipital region of the head. The police came shortly after the occurrence and took plaintiff to the American Hospital. She remained there two or two and a half hours. While in the hospital she was lying down and technicians took X-rays. When plaintiff and her parents got home they called their family physician, Dr. Robert Johanson, who was affiliated with the Presbyterian Hospital. At his request the child was taken to that hospital

for further X-rays of the cranium. The results of these X-rays were not disclosed. It can be assumed that they were negative.

The amount of the verdict indicates that the jury believed that the negligent operation of the streetcar caused the convulsive seizures which began about 10½ months after the occurrence. Defendant, in arguing that the damages awarded are excessive, states that the evidence was insufficient to establish a causal connection between the occurrence and the convulsions. On oral argument counsel for defendant stated that should there be a retrial, plaintiff would be entitled to damages for the injuries naturally resulting from the impact. Plaintiff insists that the causal relationship between the injury and the subsequent ill-being was "properly demonstrated." There is therefore presented the question as to whether the amount of damages awarded by the verdict is against the manifest weight of the evidence. Plaintiff was born with a nevus, commonly called a birthmark, on her face. A similar condition was found on the covering and the surface of the brain. A nevus is congenital and is described as a vascular tumor. Dr. Joseph Giannola said: "A vascular pertains to the blood vessels. Congenital means they are born with it. It is a tumor, not a blood clot. The blood vessels grow out of proportion. In other words, they grow like wild fire." Evidence was introduced by plaintiff that prior to the occurrence she had not been injured in any way, had not lost consciousness, suffered from convulsions or complained of head pains. Dr. Natalie Ashmenchas, called by defendant, testified that she operated on plaintiff in 1942 at the Augustana Hospital, releasing the tongue tie and also performed a tonsillectomy and adenoidectomy. Defendant does not contend that these operations had any connection with the convulsions. Persons who knew plaintiff testified that except for the

birthmark, they observed nothing abnormal about her before the occurrence.

Following the occurrence plaintiff continued under Dr. Johanson's care. She complained of severe pains over the right eye. She was irritable and nervous. She was given sedatives and ice packs were placed on her head. The summer following the occurrence she spent about one half of each day in bed. Hermine Steavenhangen, called by plaintiff, testified on cross-examination, that she saw plaintiff during the summer of 1943 (following the accident in May, 1943) at a summer home occupied by plaintiff's family at Twin Lakes, Wisconsin, and that plaintiff was playing normally with other children on numerous occasions. In September, following the occurrence, plaintiff attended a kindergarten school. Mrs. Olson testified that her daughter would be brought home from school by the principal because of head pains. She would be taken to Dr. Johanson when the pain became too severe. On March 27, 1944, about 10½ months after the occurrence and while under the care of Dr. Johanson, she had a pain in the ear and head and began to convulse, with twitching starting on the left side. She finally went into unconsciousness and was taken to the Presbyterian Hospital in an ambulance. During this trip she had six or seven convulsions, and she remained at the hospital about 10 days. Dr. Mary E. Kostalek, a physician, admitted plaintiff to the hospital and testified that plaintiff was in a convulsive state, with chronic twitchings of the arms and legs; that she was shaking all over; that witness gave her "a thousand cc's of intravenous glucose" and other medicine including a sedative; that she again saw plaintiff at nine o'clock the following morning; that plaintiff was no longer twitching or shaking; that plaintiff was awake and very irritable; and that she saw her again at noon, when the child was screaming and restless. At that

time witness was on the service of Dr. A. H. Parmalee, and explained that the phrase "on someone's service" means that at that time she is taking care of the patients of a given doctor when he is not there. She said that at the time of the trial Dr. Parmalee was in California and Dr. Johanson was practicing medicine in Pasadena, California.

Plaintiff used to scream at night after the first convulsion. Beginning with the convulsions in March 1944, until the following January, she had six or eight seizures. When she would go into a convulsion her eyes would focus and she would froth at the mouth. After a minute or two she would relax and go to sleep for about a half hour. On July 13, 1944, she had a severe seizure which lasted 2½ to 3 hours. At that time she was frothing at the mouth, biting her tongue and unconscious. She was taken to the Presbyterian Hospital in an ambulance, where she was confined 3 days. In September 1944, she returned to school. The principal testified that it was necessary that she be sent home because of her physical condition. His attention was first called to the child by her frequent absences from school. She did not play with the other children nor did she play as the other children did, but sought the companionship of older children. She complained to her teacher about headaches. Once or twice a week a teacher called plaintiff's mother to come and take her home. This teacher testified that plaintiff's grades were low and that she spent more than one year in second grade. When plaintiff came home her mother would give her phenobarbital and sometimes the child would go into a convulsion and doze off afterwards. Between July 1944, and January 20, 1945, the child had 6 or 8 attacks, when she lost consciousness from 1 to 2 minutes, following which she would sleep about a half hour in an apparently exhausted state. On January 20, 1945, she had a series of convulsions and

was rushed to the Presbyterian Hospital in an ambulance. The convulsions were described as 6 or 7 series before she arrived at the hospital. Upon arrival at the hospital she was again seen by Dr. Mary Kostalek, who found her apparently unconscious and having constant right-side twitching. While she was in the hospital a ventriculogram was made by Dr. Adrian Verbrugghen. He is a well known neurological surgeon and admittedly one of the leaders in that field. A ventriculogram is an X-ray taken to visualize the ventricles in the brain to find out if they are distorted by tumors or other lesions. The ventricles are cavities in the brain and contain a cerebrospinal fluid which is also found in the canal of the spinal cord. There are lateral and vertical ventricles. Dr. Verbrugghen said that in making a ventriculogram the child "was put to sleep"; that he made two very small holes in the top of the skull and introduced a hollow needle into the ventricles which contained fluid; that the fluid was allowed to escape and was replaced by air; that the fluid can be allowed to escape in several ways; that the method he used was to tap the lower ventricle; that the fluid ran through the lower one and out; that it was replaced by air which was then photographed by X-ray, which is the standard procedure; that the holes were made in the back of the head; that he cut through the skin; that the bone was exposed and an ordinary drill used to go through the bone; that then the envelopes which cover the surface of the brain are cut; that finally the blunt needle is inserted through the brain to the ventricle; that plaintiff had four ventricles; and that he and his assistant saw three of them.

Dr. Mary E. Kostalek testified that on January 27, 1945, at the Presbyterian Hospital "an encephalogram was done," which she defined as an X-ray taken after removal of the spinal fluid and the injection of the air, and that it was taken to reveal abnormalities in the

contour of the brain. She stated that in the encephalogram there were no findings "to localize any cerebral lesions." Witness, apparently referring to the encephalogram, said that Dr. "Lassa still thinks that exploration is justified"; and that Dr. "Basso was the head of the department of neurology of the Presbyterian Hospital and that at the time of the trial he was dead." She said that Dr. Bailey also saw the child; that he rarely comes to the hospital; and that at the time of the trial he was at the University of Illinois Medical School which is located in Chicago.

Plaintiff offered no evidence that the ventriculogram showed any distortion of the ventricles. Apparently, no diagnosis could be established from the ventriculogram and further exploration was decided upon. On February 5, 1945, Dr. Verbrugghen performed a craniotomy, which consists of opening up the head and exposing the brain. Three membranes, namely, dura mater, arachnoid mater and pia mater, cover the brain and lie between it and the cranial cavity. The most external of the three is the dura mater, which is tough and fibrous. The arachnoid is a membrane of great delicacy and transparency, which loosely envelopes the brain. Between the dura mater and the subjacent arachnoid membrane is a fine space containing a minute quantity of limpid serum, which moistens the smooth inner surface of the dura and the corresponding smooth outer surface of the arachnoid. The arachnoid mater is separated from the brain by the pia mater. Between the arachnoid mater and the pia mater is a distinct space called subarachnoid.

In performing the craniotomy Dr. Verbrugghen cut the skin in a horseshoe manner, turned it down along with the muscle on the side of the head, thus exposing the bone, cut several holes in the bone as in the ventriculogram, passed a wire saw through the holes which was manipulated by hand, by the use of which the cuts

were joined and the bone laid back exposing certain portions of the dura mater or outer covering of the brain. That in turn he cut in a semicircle and laid back, exposing the brain itself. He found that the surface of the dura mater was "extremely vascular or had a network of blood vessels on it like a birthmark," and on reflecting (turning back) the dura mater he found the same condition applied "more or less to the surface of the brain." It had a "matter of small blood vessels" over the surface and it "looked very much like a birthmark does on the skin." When he reflected the dura mater he found a collection of yellow fluid which gushed out, and "which evidently had caused pressure on the brain because the brain did not pulsate well before that time, and it should normally." When this fluid was removed, pulsations were much freer and the brain "seemed to be released of some pressure." The yellow fluid was below the dura; it was subdural. The brain pulsates with the heartbeat as the blood comes into the cranium. "If there is anything in there which makes the contents tight, the pulsation is not seen because it requires great pressure to produce a movement in something that is already tight." He said: "We associate collections of yellow fluid of this character with injury." He also drained the arachnoid fluid out to provide more room and left a soft spot in the scalp "so that if we wanted to treat this by X-ray we could do so." He stated that a person can see through the arachnoid mater, which is a transparent membrane. He and his assistant then wired the piece of bone back into place and sewed the skin back over it. Dr. Parmalee "may have called" him into the case. Dr. Verbrugghen had not seen the child since the operation. His examination disclosed that plaintiff had an abnormal condition of the brain since the time of her birth. In his opinion the collection of yellow fluid was not there since birth. He did not say how long it had

been there. He also said that the collection of yellow fluid "can cause pressure on the brain." Based on a reasonable degree of medical and surgical certainty, he was of the opinion that the collection of yellow fluid described "can be caused by an injury." He did not know of any operations on the child other than the ventriculogram and the craniotomy.

Plaintiff left the hospital on February 17, 1945, and thereafter was confined to bed for about a month. She continued to have slight convulsions. The pain would come about once a day. She had about 12 seizures from February 5, 1945 to December 27, 1949. On that day, after about two weeks of severe headaches, she went into a severe convulsion. About 12:30 a. m. she was taken to the Augustana Hospital, where she was seen by Dr. Giannola, an interne, who found her in a state of complete unconsciousness, her body was rigid, and she was also convulsive, which he described as a tonic convulsive seizure. He also described her condition as a "clonic affair." Clonus is defined as a spasm in which rigidity and relaxation succeed each other. He did not try to establish a diagnosis. He administered sedatives. It became necessary to use an ether anesthesia to stop the convulsion. She was in a convulsive state for 10 minutes after she arrived at the hospital. From his observation of the child he was under the impression that she had a right subdural anomaly with Jacksonian seizures due to trauma. He stated he did not "rule out Sturge Weber syndrome," which is one in which a vascular abnormality or birthmark appears on the face and also on the brain covering and brain itself. Dr. Giannola testified that the child was confined to the hospital about a month. While she was there an X-ray study was made by means of an arteriogram in which a radiopaque substance was injected into the blood vessel of the neck so as to picture that substance going through the blood vessels in the brain.

56

Dr. Wesley Gustafson testified for the defendant. He is a neurological surgeon connected with Augustana Hospital and other hospitals. At the time plaintiff was in the Augustana Hospital in December 1949, and January 1950, he was called into consultation. He obtained plaintiff's history from Dr. Verbrugghen and recommended an arteriogram. He said that the child's birthmark and Dr. Verbrugghen's statement of vascular abnormality made him suspect a vascular abnormality and that is why he recommended an arteriogram. He said "the arteriogram did not show up any vascular abnormality on the cortex (meaning the surface of the brain), but that it did show an aneurysm of the internal carotid artery near the region of the occipital artery." That was his final diagnosis. It was his belief that the aneurysm had been present since birth. An aneurysm is a weak spot in the blood vessel at which point the blood vessel puffs out. Dr. Gustafson performed an operation and ligated or tied off the internal carotid artery on which there was an aneurysm. To do this he made an incision in the neck region. He tied the vessel with two silk threads, completely closing it and the flow of blood. The purpose was to prevent further leakage of blood from the aneurysm.

Dr. Verbrugghen and Dr. Gustafson are the two surgeons who attended and operated on plaintiff. Neither indicated any diagnosis consistent with the theory that the occurrence of May 12, 1943, was the cause of the convulsions. Dr. Verbrugghen mentioned a yellow fluid which he said is usually associated with injury. He did not give an opinion as to how long the yellow fluid had been there. The streetcar injury occurred 21 months before the yellow fluid was found. Ten days before the fluid was found two holes were made in plaintiff's head, the coverings of the brain were cut and a blunt needle inserted directly into the brain. Dr.

Verbrugghen stated that the yellow fluid was causing pressure on February 5, 1945, yet the ventriculogram which he made on January 25, 1945, for the purpose of showing pressure on the brain, did not show pressure at that time. Dr. Gustafson said the yellow fluid usually clears in a few weeks and that to him its presence indicated a recent standing. His diagnosis was an aneurysm of the internal carotid artery present since birth. He found no evidence of subdural hematoma. On cross-examination by plaintiff he said there were three factors that could be involved in the convulsions: (1) a malformation of blood vessels on the surface of the brain; (2) the aneurysm; and (3) the streetcar accident. He said it was doubtful that the accident was involved because of the time element, and that the 15 to 20 minutes unconsciousness on that evening indicated to him concussion of the brain and a mild injury. It is obvious that it was his belief that the leakage from the aneurysm was the cause of the convulsions, since the purpose of the operation he performed was to prevent further leakage of blood from the aneurysm. He said a ruptured aneurysm usually shows symptoms in 28 to 48 hours, that a convulsion is a fairly common early symptom of a ruptured aneurysm, that when an aneurysm ruptures, death follows within the first three weeks in 25% to 30% of the cases and in another 25% to 30% in the first year. He indicated that when an aneurysm ruptures there would be blood in the spinal cord, but he made no spinal tap, saying that he did not do that routinely if they could use other clinical methods. He also said that the commonest time for an aneurysm to rupture is when the person is between 20 and 30 years of age, and ordinarily you do not get a ruptured aneurysm in children five years old.

Two doctors specializing in neurology and psychiatry testified as experts for plaintiff. Neither was a brain surgeon. Dr. Leo Kaplan, one of the experts, examined

plaintiff a week before the trial at the request of her attorney. He said there could be a causal connection between the accident and the convulsions on the ground that trauma could cause a rupture in the congenital malformation of blood vessels, allowing a bloody fluid to accumulate and cause pressure on the brain. Dr. Joseph Luhan, the second expert, first heard of the· matter at 1:30 p. m. of the afternoon he testified. Although he stated there could be a causal connection between the accident and the convulsions on much the same grounds given by Dr. Kaplan, he indicated it was highly conjectural, saying

"Yes, if she had played and been partially well for ten months, I would have more doubt in the matter. I mean I would consider that it then would be a matter of — oh, conjecture on anybody's part as to which was responsible. We have to explain the subdural hydroma, the collection of fluid. I want to point out that this subdural — this slow bleeding or subdural hydroma which occurs after accidents may not show some symptoms right after the accident. We have had a number of patients who for two or three months have had no symptoms and then develop progressive symptoms. But you say ten months. That is a long time, and if there were ten months, I would say I wouldn't know one way or the other."

The amount of the verdict indicates that the jury believed that the convulsive seizures resulted from the occurrence. No attending physician or surgeon made any diagnosis which would indicate that the occurrence was the cause of the convulsions and none of them gave an opinion that it was the cause of the convulsions. Neither brain surgeon who operated on plaintiff did so on the theory that the accident caused the convulsions. Neither gave any treatment for anything other than a congenital malformation of the blood vessels of the brain. Some of the attending physicians

did not testify. Two pediatricians, Dr. Johanson and Dr. Parmalee, who attended plaintiff during the period in question were in California. They did not testify. Another brain surgeon, Dr. Bailey, who saw plaintiff, did not testify. Plaintiff was born with two types of congenital malformation of the blood vessels of the brain, either one of which could cause convulsions. Dr. Gustafson said such a condition would be sufficient in itself to produce convulsions. Dr. Luhan, who testified for plaintiff as an expert witness, said that the hypothetical person described to him had a tendency to have epileptic fits because of the vascular malformation, and that such a condition could cause convulsions without traumatic experience or accident. When Dr. Verbrugghen said that he left a soft spot for possible X-ray treatment, that treatment could only be meant for the blood vessel tumor. Dr. Gustafson, the other brain surgeon who operated on plaintiff, discovered and diagnosed the aneurysm as a result of the arteriogram. It was his opinion that the aneurysm was responsible for the convulsions. The operation was performed to correct this congenital condition. It is clear that the two brain surgeons who attended and operated on plaintiff believed and acted on the belief that a congenital vascular malformation of the brain was responsible for the convulsions. Dr. Verbrugghen said that when he performed the craniotomy and opened up the dura mater, a yellow fluid gushed out, which apparently had caused pressure on the brain. He did not say how long the fluid might have been there. Dr. Gustafson said that yellow fluid usually clears within two or three weeks after the hemorrhage, and that its presence to him would indicate a recent standing. Dr. Verbrugghen said that the yellow fluid is associated with and can be caused by injury. The yellow fluid was found on February 5, 1945, approximately 21 months after the accident, but less than two

weeks after the ventriculogram on January 25, 1945. In performing the ventriculogram holes were drilled in plaintiff's skull, the dura and arachnoid coverings of the brain were cut open and a blunt needle inserted into the brain. There is great force in defendant's contention that the fluid which bathes the brain leaked into the subdural space and mingled with blood caused by the performance of the ventriculogram. It will be recalled that Dr. Verbrugghen said the yellow fluid evidently caused pressure on the brain. The purpose of the ventriculogram is to show pressure on the brain, yet the ventriculogram was negative. This is further indication that the yellow fluid was not present before the ventriculogram, but was a result of it. When he cut into the brain to make the ventriculogram he found no yellow fluid. He did not use the yellow fluid as a basis for his diagnosis, and he did not make a diagnosis of subdural hematoma (blood tumor) or subdural hydroma (liquid tumor).

Plaintiff's two expert witnesses said that there might be a causal connection between the accident and the convulsions. Their theory was that the accident ruptured some of the malformed blood vessels causing bleeding which accumulated and became the yellow fluid, and that this in turn caused pressure on the brain, causing the convulsions. As hereinbefore stated, Dr. Luhan, one of these experts, indicated that whether there could be a causal connection between the accident and the convulsions was conjecture. It will be recalled that following the accident there was no evidence of brain damage, no fracture of the skull and that no doctor testified as to any findings or diagnosis for the ten-month period following the accident. Plaintiff's recovery is thus based on the testimony of one expert, not an attending physician, who said that there might be a causal connection between the accident and the convulsions. Dr. Giannola, the interne, did not make

a diagnosis. He wrote down an impression as the result of his observation of plaintiff at the time of her admittance to the hospital. Dr. Gustafson said that an interne states an impression gained from an examination of the patient, that this is part of his training, that the impression is the basis on which they work until they prove or verify the final diagnosis, and that the final diagnosis was an aneurysm of the internal carotid artery.

From a careful study of the transcript of the evidence we are satisfied that the part of the verdict finding the damages is against the manifest weight of the evidence and that there should be a new trial on the issue of damages. Although the issue of liability has been decided in favor of plaintiff, the parties should have the right to present witnesses as to the occurrence or to stipulate thereon so that the testimony on the issue of damages may be understood. For the reasons stated the judgment of the superior court of Cook county is reversed and the cause is remanded for a new trial on the issue of damages.

*Judgment reversed and cause remanded with directions.*

FRIEND, J. and NIEMEYER, J., concur.