JANET HORWITZ, a Minor, by LILLIAN HORWITZ, her mother and next friend, and DR. HARVEY HORWITZ, her father, Plaintiff-Appellant, *v.* MICHAEL REESE HOSPITAL *et al.,* Defendants-Appellees.

(No. 53107;

First District—October 30, 1970.

510

DIERINGER, P. J., dissenting.

James A. Dooley, of Chicago, for appellant.

Lord, Bissell & Brook, of Chicago, (Stephen A. Milwid and Richard E. Mueller, of counsel,) for appellees.

## ORDER
### May 3, 1972

Plaintiff filed a petition for rehearing. Defendants filed a reply to the petition and in turn plaintiff filed a reply thereto. We allowed a rehearing. On our own motion we rescheduled the matter for Oral Argument. After thorough and further consideration of the case, we adhere to the positions taken in the opinion as previously filed.

The opinion filed on October 30, 1970, will be again adopted and filed as the opinion of the court.

ADESKO, J.: BURMAN, J., concurring.

DIERINGER, P. J., dissenting.

Mr. JUSTICE ADESKO delivered the opinion of the court:

Plaintiff, Janet Horwitz, sued defendant Michael Reese Hospital and defendant Air Reduction Company, Inc., for damages allegedly caused by the hospital's negligent treatment and the company's defective manufacture of an incubator in which she was placed while a three day old patient at the hospital. At the close of plaintiff's case, the trial judge directed a verdict for the defendant manufacturer. The jury returned a verdict for the defendant hospital. From the judgments entered thereon, plaintiff appeals.

Plaintiff maintains (1) that the trial court erred in refusing to direct a verdict for plaintiff against the hospital at the close of all the evidence on the issue of liability where no defense to plaintiff's proof of negligence was made; (2) that the trial court erred in directing a verdict for the manufacturer at the close of plaintiff's case; (3) that the jury verdict was against the manifest weight of the evidence and (4) that the trial court erred in admitting certain evidence over plaintiff's objection on behalf of defendants. In order to consider these assignments of error it will be necessary to review the evidence in some detail.

Janet Horwitz was delivered by Dr. Abraham Lash, a long time practitioner in obstetrics at Michael Reese Hospital, on May 10, 1947, around 9:00 A.M. Dr. Lash testified that he examined the baby's color, found that she cried lustily, listened to the lungs and found all orifices and reactions of the infant normal. Although baby Horwitz had been delivered after a full 37 week gestation period, she weighed only 2020 grams, or 4 lbs. 6 oz., and since her weight was under 5½ lbs., she was classified as a premature baby. The pediatrician, Dr. Philip Rosenblum, after examining the child's reflexes, especially the Moro reflex, found everything in order, but still requested that the child be placed in an incubator as soon as possible since she was premature. Because the incubator beds in the premature station were all occupied, the child was placed in a Hess incubator in the nursery.

While the child was in the incubator, oxygen was administered on May 10 and 11, as needed and the bed was heated at periodic intervals. On May 11, the child's weight had fallen to 1910 grams and May 12 had increased to 2000 grams. According to a report made on May 15 by Miss Lorentz, director of nursing at the hospital, at about 4:30 P.M., on May 12, the third day of the child's life, the child took a feeding and thereafter became cyanotic (blue in color) so that oxygen had to be administered. At about 10:00 P.M., according to the report, another nurse reported that the baby was very lethargic, apathetic, cold to the touch and not taking feedings well. Because the baby felt cold, heat was turned on in the Hess incubator to the fourth heat, and the graduate nurse who came on duty at 11:30 P.M. was warned to watch the bed since it had been adjusted to the fourth heat. The baby was fed at 12:00 midnight, 3:00 A.M., and 6:00 A.M., and each time, according to the graduate nurse on duty, the baby still felt cold to touch. The night report states: "Baby takes formula poorly, very listless, responds poorly to stimuli." It must be noted that this evidence comes from a specially prepared report made by the director of nursing on May 15, 1947, and not from the hospital record. The hospital record, which should contain all matters concerning the care of a patient, reveals none of the above occurrences for the night of May 12-13. Even the child's temperature for the night of May 12-13 was not noted in the hospital record.

At 7:30 A.M., when the day staff came on duty, the head nurse discovered that the baby was having convulsions and called the resident in pediatrics. Upon arrival, Dr. Hyman Morris found the infant in the incubator to be cyanotic, twitching, foaming at the mouth, and dehydrated as indicated by a depressed fontanel. Dr. Morris touched the incubator and found it to be uncomfortably hot. The doctor testified that normally an incubator is only comfortably warm.

The child was removed from the incubator. Her temperature was taken rectally and found to be 102°. Dr. Morris then called his senior resident in pediatrics, Dr. Martin Sachs. Dr. Sachs testified that he found the child frothing at the mouth, twitching, blue around the mouth and apparently dry. Since she looked dehydrated, she was given glucose and phenobarbital. By 11:00 A.M. the child's temperature was 99° and by noon 98°.

During the evening of May 13, 1947, the child continued to have convulsions and twitching and as a result the administration of phenobarbital was continued. An examination on May 15, 1947, found the child's fontanel full and her weight increased to 2020 grams. By May 17, it was 2030 grams and when she was released from the hospital to her parents in "good condition" her weight was 2175 grams.

Throughout her entire life, Janet Horwitz has had severe medical problems. As a child she had difficulty retaining food, could not turn in bed and had a slight paralysis on the right side. She could not crawl, did not walk until 4½ years old and has had difficulty in speaking. She has spent most of her life in laboratory schools, institutes and hospitals for anti-convulsive therapy, speech therapy and stimulation of her brain cells. Various doctors who testified in this case described Janet's condition as a central nervous system disorder, cerebral palsy and mental retardation.

Plaintiff's witnesses, Dr. Morris, Dr. Sachs and Dr. Rosenblum, testified in varying degrees that Janet's May 13 condition of convulsions, foaming at the mouth, dehydration and cyanosis was directly connected with the overheating of the incubator. Dr. Sachs expressed the opinion that these conditions could cause brain damage. Dr. Frederick Gibbs, a neurosurgeon, testified that the incubator incident might or could have been the cause of the plaintiff's condition of ill being. Furthermore, nurse Lorentz's report, plaintiff's Exhibit 1A, found "several evidences of poor nursing in the circumstances surrounding the care of the baby * * * (namely * * * no thermometer in the incubator * * * the baby's temperature was taken routinely only once in 24 hours * * * (and) loose routines and lack of routines in the newborn nursery." Armed with this expert testimony and these admissions, plaintiff maintains that the trial court erred in refusing to direct a verdict for plaintiff against the hospital at the close of all the evidence on the issue of liability where no defense to plaintiff's proof of negligence was made.

Defendant offered as a defense the testimony of three pediatric specialists, Dr. Meyer A. Perlstein, a specialist in pediatric neurology and diseases of the brain that occur in children before they reach the age of

adolescence, Dr. David Y-Yung Hisia, specialist in pediatrics and professor at Northwestern University Medical School and Dr. William Silverman, professor of pediatrics at Columbia University Medical School. All three doctors, in response to hypothetical questions which embraced the present conditions of ill being of the child, testified that in their opinion the incubator incident was not the cause of the condition of ill being. The pediatric specialists described a syndrome known as intrauterine growth retardation, unknown in 1947 and described in great detail only in the last six or seven years. Most authorities believe this results from lack of nourishment of the baby in the womb which causes a low birth weight for a full term baby and an organic under-development including the brain. One of the pediatricians testified that 50 to 60 percent of these babies have mental retardation since intrauterine growth failure babies have low blood sugars and as a result the baby lacks the necessary nutrients for the brain. Low blood sugar or the hypoglycemia syndrome occurs in babies around 48 to 72 hours of age. The early signs of the hypoglycemia syndrome are respiratory failure, cyanosis, lethargy, convulsions and low blood sugars. The pediatricians pointed out that these signs applied to Janet Horwitz. She had difficulties, including cyanosis, lethargy and poor response to stimuli prior to the incubator incident. Although a baby of 37 weeks gestation, she weighed only 2020 grams, which raises the inference of undernourishment. This inference is supported by the fact that Janet was substantially smaller than either her sister, a first child, or her brother, a third child, both normal, since generally a second child is of greater size than the first.

Defendant's witnesses were also of the opinion that neither the baby's temperature nor the alleged dehydration was the cause of her condition of ill being. The doctors pointed out, that although the baby's temperature was 102° when taken immediately after being removed from the incubator, such a temperature was not high enough for a long enough period of time to cause brain damage. With respect to dehydration, the doctors testified that the liquid of the rectum leaves the baby first with the fluid in the brain conserved until everything else is gone and that the baby must lose more than 10 percent of its fluid volume before dehydration can even be detected clinically. Defendant's witnesses were of the view that Janet Horwitz was not dehydrated sufficiently to cause brain damage because if she had been, there would have been a greater weight loss. It is to be noted in this regard that while the doctors who testified for plaintiff were of the view that dehydration or a high temperature could cause brain injury, none of them explained the degree of tempera-

ture or the amount of dehydration required to cause such injury.

Considering the testimony of the defendant's witnesses as well as the plaintiff's witnesses, we hold that the trial court did not err in refusing to direct a verdict for plaintiff against the hospital. Plaintiff strenuously argues that she sustained some injury as a result of the incubator incident, and that this incident was due to the negligence of the defendant hospital as it admits in its report and whatever her injuries might have been, however slight, she should be entitled to a directed verdict which would still leave the question of causal connection to the jury since the jury would ascertain what damages, if any, she sustained. Plaintiff contends that she was entitled to a directed verdict on liability and that the only question which should have been left to the jury was one of damages.

■■ The element of the proximate cause is an essential part of every cause of action for negligence. The Illinois Supreme Court has repeatedly announced the rule that questions of negligence and proximate cause are ordinarily questions of fact for the jury to decide (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill.2d 28, 42, 139 N.E.2d 275.) In *Ney v. Yellow Cab Co.* (1954), 2 Ill.2d 74, 84, 117 N.E.2d 74, the court stated: "The debatable quality of issues such as negligence and proximate cause, the fact that fairminded men might reach different conclusions, emphasize the appropriateness and necessity of leaving such questions to a fact-finding body." The debatable quality of an issue such as proximate cause in a case involving medical science is especially pronounced. As stated by Louis G. Davidson in an article entitled "Testimony as to Personal Injuries" in the 1956 Illinois Law Forum 390, page 421:

"The courts do not dwell in an ivory tower. They know as do laymen that medical science is not exact and certain; that equally qualified experts often sharply disagree as to causal connection; that factors known to be causative of a condition today were not known or accepted as causative only ten or twenty years ago. The ultimate decision as to causal connection has been reposed, and wisely so, in the trier of facts."

■■ Since various conclusions could be drawn from the evidence in the case at bar, we find that the trial court correctly refused to direct a verdict for the plaintiff on liability, and accordingly, correctly submitted the case to the jury to resolve these differences. We find no merit in plaintiff's comparison of this case to automobile cases where defendant's negligence 'aggravated' the plaintiff's prior physical condition. For the plaintiff to argue that she was entitled to a directed verdict because the evidence showed that the overheated incubator 'aggravated' her prior physi-

cal condition is to presume causation which invades the province of the jury. The question of causation is a question of fact. *Chicago City Ry. Co. v. Saxby* (1904), 213 Ill. 274, 72 N.E. 778.

■■ Finally, regarding plaintiff's contention that defendant hospital did not rebut the negligence Miss Lorentz admitted in her report of May 15, 1947, we refer to defendant hospital's brief, pages 15 and 17:

"When Miss Lorentz concluded her investigation she knew she had a 'sick child' whose symptoms in 1947 could only be explained on the basis * * * the only thing which could have gone wrong was the incubator must have malfunctioned. This conclusion (was made) in 1947 * * * (not) * * * in 1967, when medical knowledge developed to show that symptoms pointed to an intrauterine growth failure, not an equipment failure * * * (Consequently), these admissions against interest made outside of a court proceedings are not conclusive on the party against whom they are offered, but may be explained, rebutted or contradicted by other evidence."

Defendant offered as a defense the testimony of the three pediatric specialists who attempted to explain Miss Lorentz' report of May 15, 1947. We hold that the plaintiff did not establish a *prima facie* case unrebutted by the defendant, so that the trial court was not compelled to enter judgment for the plaintiff.

■■ Plaintiff's second contention is that the trial court erred in directing a verdict for the manufacturer at the close of plaintiff's case. The plaintiff's complaint charged defendant, Air Reduction Inc., with negligence in the manufacture of the incubator in which plaintiff was placed and premised liability on strict liability. We find that the plaintiff failed to produce evidence as to the specific rheostat settings in the Hess bed at the time of the occurrence, the date of manufacture and purchase of the bed, the nature of the specific defect in the bed, the condition of the bed when it left the defendant manufacturer, and consequently, failed to sustain her burden of proof in accordance with standards set by *Garofalo v. General Motors* (1968), 103 Ill.App.2d 389, 395, 243 N.E.2d 691 and *Rotche v. Buick Motor Co.* (1934), 358 Ill. 507, 193 N.E. 529. We point out that plaintiff's Exhibit 1A, the report of Miss Lorentz, was offered in evidence as to the defendant hospital only and not as to the defendant manufacturer. Furthermore, the plaintiff was never even able to identify the bed in question. We hold that the trial court did not err in directing a verdict for the defendant manufacturer at the close of plaintiff's case.

Plaintiff's third contention is that the jury verdict against the plaintiff and for the defendant hospital was against the manifest weight of the

evidence. In accordance with our holding on plaintiff's first contention, we find that a question of fact was presented for the jury and that its verdict was not against the manifest weight of the evidence.

■■■ Plaintiff's fourth contention is that the trial court erred in (a) permitting Dr. Silverman to testify in response to a hypothetical question posed by defense counsel, which question included the opinion of Dr. Hsia elicited in response to a hypothetical question posed by defense counsel to Dr. Hsia and (b) in permitting the cross-examination of Dr. Gibbs. Regarding the first part of this contention, Dr. David Y-Yung Hsia was an examining doctor as well as an expert witness who responded to a hypothetical question of defense counsel. Dr. Hsia examined Janet Horwitz in 1966 and made a diagnosis of mental deficiency with a minor degree of non-specific neurological involvement. Dr. Hsia's diagnosis at trial, having had the benefit of the history of the child in the hypothetical question given to him, was incorporated in the hypothetical question given to Dr. Silverman. Plaintiff objects to the incorporation of the diagnosis in the hypothetical question to Dr. Silverman since it could only elicit an opinion based upon an opinion. We disagree with plaintiff's contention on the authority of *Gus T. Handge and Son v. Industrial Commisson* (1965), 33 Ill.2d 201, 203, 210 N.E.2d 498, where the Illinois Supreme Court permitted a hypothetical question to one doctor which included the "clinical impression" of another doctor so long as that impression was "within the realm of direct or circumstantial evidence as shown by the facts or reasonable inferences." We find that the trial court did not err in permitting Dr. Silverman to respond to a hypothetical question which included Dr. Hsia's diagnosis since that diagnosis was based on the doctor's examination and was "within the realm of direct or circumstantial evidence as shown by the facts or reasonable inferences." (*Armour and Co. v. Industrial Commission* (1937), 367 Ill. 471, 475-476, 11 N.E.2d 949.) Regarding the second part of plaintiff's contention, we find that the cross-examination of Dr. Gibbs was proper. The general rule is that the cross-examination of a witness should be confined to matters brought out upon direct examination. (*Hansen v. Miller* (1892), 145 Ill. 538.) But in determining the scope of the 'matter' testified to on direct examination the rule is not to be given a narrow or technical application. (*West Chicago St. R.R. Co. v. Reddy* (1896), 62 Ill.App. 53.) This is especially true with respect to expert medical testimony, matters not within common knowledge and experience, which is one of the least satisfactory methods of proof. (*Muscarello v. Peterson* (1960), 20 Ill.2d 548, 150 N.E.2d 770.) We find the cross-examination of the specialist regarding the findings he testified to on direct examination in relation to the abnormalities described in his own

article on infantile cerebral palsy proper under the broad rule announced in *Muscarello v. Peterson, supra.*

For the foregoing reasons, we reject all of the plaintiff's assignments of error. The judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

BURMAN, P. J., and MURPHY, J., concur.

Mr. PRESIDING JUSTICE DIERINGER dissenting:

I respectfully dissent. This is another unfortunate episode in this litigation. To get a trial, plaintiff had to obtain a writ of *mandamus.* (*People ex rel. Horwitz v. Canel* (1966), 34 Ill.2d 306.) When she obtained a trial, the Circuit Court directed a verdict for the manufacturer of the incubator. Although the hospital defended solely on the issue of the casual relationship between the May 13, 1947, incident and the abnormal conditions of the child over a 20 year span, the majority holds she is not entitled to recover against the hospital, notwithstanding the uncontradicted evidence of its negligence.

As the majority opinion correctly points out, all the evidence of the infant being listless or in anywise abnormal comes not from the hospital records, but rather from an investigative report made after the injury. Whether the plaintiff was or was not listless prior to the happening of the occurrence is immaterial. There was negligence, and the child sustained some injury.

At 11:00 P.M. the night prior to May 13, 1947, the day on which the incubator overheated, the night nurse came on duty and was advised by the nurse she relieved that there had been difficulty with this incubator. She handled plaintiff three times between 11:00 P.M. and 7:00 A.M. and found nothing unusual about her.

Betwen 7:00 and 8:00 A.M. on May 13, 1947, three physicians saw the child convulsing, foaming at the mouth, suffering from hyperpyrexia (unusually high body temperature), as well as depressed fontanel, which evidences dehydration or loss of fluid. These three men, one a long time practitioner in pediatrics and two residents in that phase of medicine, found the incubator hot. Their opinion was that these conditions of the infant were directly caused by the overheating of the incubator. She had not, even by the investigative report, ever suffered from any of these conditions before being overheated in the incubator.

A resident, the first one on the scene, had been called by nurses who advised him that the incubator had overheated during the night. He so recorded this fact in the record. The hospital record for May 13, 1947, noted the baby's temperature at 107 plus. One-half hour after the incu-

bator was shut off and the child was still in it, her temperature was 102. One doctor testified the child's body temperature goes right up with the incubator. After the incubator was shut off, the temperature would recede. Dr. Gibbs testified it is pretty clear it had been extremely hot, and brain cells are very sensitive to these temperature changes. The plaintiff has severe and crippling brain damage and is virtually helpless.

At the trial court level, the hospital's position was that the child's present condition at age twenty was not due to the incubator injury. It produced three witnesses, all experts in the field of pediatrics. To each of these was propounded a hypothetical question in which were listed all the handicaps of the child across a twenty-year span, and whether there was a relationship between the incubator incident and these conditions. In this hypothetical question, is set forth these facts:

(a) At 7:30 A.M. a nurse in the maternity ward noted the baby convulsing;

(b) The incubator was hot to the touch;

(c) The child was found in a dehydrated state, running a fever and suffering from hyperpyrexia.

One of its witnesses, Dr. Perlman, specifically noted that "overheating of an incubator would not be good for any infant." Dr. Hsia, another defendant's expert, specifically stated that this episode could cause convulsions.

The hospital had no thermometer in the incubator to determine the temperature within it. This was in violation of a regulation of the Board of Health of the City of Chicago pursuant to an ordinance (Municipal Code 9-11) and that of the Illinois Department of Health enacted pursuant to statute (Ill. Rev. Stat. 1945, ch. 111½, par. 22). Such is a violation of the statute.

Apart from these specific facts, as well as those set forth in defendant's investigative report, the infant, as well as the incubator, were under the control of the hospital. The doctrine of *res ipsa loquitur* was thus applicable. (*Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill.2d 446; *Drewick v. Interstate Terminals, Inc.* (1969), 42 Ill.2d 345; *Moore v. Jewel Tea Co.* (1969), 116 Ill.App.2d 109 (1970) 46 Ill.2d 288.) Plaintiff pleaded the doctrine, and the jury was so instructed, but at no time did the hospital undertake to explain this incident. The burden was on the hospital.

The position of the majority that according to defendant's experts in responding to the hypothetical question the infant suffered from intrauterine growth retardation "unknown in 1947" cannot explain the overheating of the incubator. The hyperpyrexia, abnormal body heat, de-

hydration and convulsions are all admitted sequelae of being in this overheated incubator.

No one has urged, either in the trial court or in this court, that overheating does not cause these after-effects.

What the majority has held, in effect, is that there cannot be a directed verdict for the plaintiff in any instance because this determines the issue of proximate cause.

In a tort action, negligence and proximate cause are separate and distinct issues. Negligence is frequently an issue of law. This is clear from cases wherein trial courts have been held to properly direct a verdict for the plaintiff (*Harrison v. Bingheim* (1932), 350 Ill. 269; *Sughero v. Jewel Tea Co.* (1967), 37 Ill.2d 240), and courts of review have reversed judgments for new trials solely on the issue of damages. *Calvetti v. Seipp* (1967), 37 Ill.2d 596; *Tennes v. Tennes* (1943), 320 Ill.App. 19; *Olson v. Chicago Transit Authority* (1952), 346 Ill.App. 47.

The *Calvetti* case (37 Ill.2d 596) is particularly significant. There was a verdict for the defendant which was reversed and remanded for trial on the sole issue of damages. (*Calvetti v. Seipp* (1966), 70 Ill.App.2d 58.) This judgment of the Appellate Court was affirmed. The decision of the Supreme Court in the *Calvetti* case came at the same term as that of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, whereby Illinois trial courts for the first time were empowered to weigh the evidence on a motion to direct a verdict at the close of all evidence.

Powers of trial and reviewing courts have been expanded, rather than circumscribed, within the last five years. (See: *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494; Supreme Court Rule 366(a)(5).)

In directing a verdict, the court determines an issue of law, namely, that the defendant is negligent. The damages caused by such negligence is another question. This is left to the jury. But it is a grave error for a court to permit a jury to determine a question of law. Here there was no issue of fact of the defendant hospital's negligence. The damages proximately caused by its conduct was the only issue between plaintiff and defendant hospital.

In the brochure of the manufacturer, the following statements are made:

"The Hess infant incubator and bed is designed and constructed so as to maintain a constant temperature with a safe maximum, a constant supply of fresh air, and a normal average humidity. It requires but little attention and regulation.

The incubator is constructed with an inner copper chamber into which the bed is set. This inner chamber is surrounded, except at the top, by

a one inch water jacket, which is covered by insulating material over which is fitted a stainless steel finishing jacket, making in all three walls, with water between the first and second and insulation between the second and third walls.

\* \* \*

The electric heating apparatus consists of a 175-watt heating element attached to the bottom of the incubator and controlled by an adjustable rheostat (heat regulator) and pilot light mounted on the incubator stand. A reserve heating element is provided for emergency \* \* \*. Over this space is fitted an adjustable frame and a removable linen cover forming a hood, the purpose of which is to aid in shielding the infant from outside air currents and in controlling temperature in case the room becomes suddenly cooled, or for use during extremely cold nights."

The evidence was that the purpose of the bed was to furnish heat with a "safe maximum," to maintain normal humidity and to furnish oxygen. But after the "safe maximum" heat had been reached, *there was no device on it which would shut off further increase in temperature.* Although the idea was to determine the heat within the incubator by looking at the face of the crib, there was nothing within the incubator to indicate the level of heat attained.

When the court directed a verdict for the manufacturer of the incubator, he said: "Ladies and gentlemen of the jury, the Court informs you that the Ohio Chemical and Manufacturing Company and the Air Reduction Corporation are no longer in this case as defendants." This statement left it to the jury to speculate why they were no longer in this case. Did they settle or was the incubator not deficient in any detail? The court misled the jury by this statement. A judge should say something to the effect that he is dismissing the defendant as a matter of law and nothing more. That this error affected the further proceedings is highly likely. The jury was, in effect, told that the incubator was not deficient in any detail, which would lead the jury to believe the hospital did nothing wrong.

The complaint against the manufacturer was based on both strict liability in tort and in negligence. The majority opinion observes:

"We find that the plaintiff failed to produce evidence as to the specific rheostat settings on the Hess bed at the time of the occurrence, the date of manufacture and purchase of the bed, the nature of the specific defect in the bed, and the condition of the bed when it left the defendant manufacturer, and consequently failed to sustain her burden of proof in accordance with standards set by *Garofalo v. General*

*Motors,* 103 Ill.App.2d 389, and *Rotche v. Buick Motor Co.,* 358 Ill. 507."

Certainly the specific rheostat settings at the time of the occurrence, the date of the manufacture, the date of purchase, a specific defect, are all immaterial in a strict liability in tort action. Under this theory, "negligence need not be proved and a plaintiff has only to prove that his injury or damages resulted from a condition of the product, that the condition was an unusually dangerous one, and that the condition existed at the time the product left the manufacturer's control." (*People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill.2d 180, 196.)

In the very nature of things, a specific defect is not a requisite for recovery. The term "defect" when employed in a strict liability in tort action has a distinct meaning. In *Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill.2d 339, 342, this term is thus defined:

"Although the definitions of the term 'defect' in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function."

It is thus obvious that so long as the product fails to perform in a manner in which it is intended and becomes unreasonably dangerous or not reasonably safe, a defect exists within the doctrine.

Nor was there any obligation to prove the condition of the bed when it left the defendant manufacturer. This, as will be noted, was a claim for defective design, in that the particular incubator was so designed that it did not have any device to cause it to be shut off when it reached a certain temperature beyond its maximum.

Liability for defective design is no stranger in this jurisdiction. See *Williams v. Brown Manufacturing Co.* (1970), 45 Ill.2d 418; *Wright v. Massey-Harris, Inc.* (1966), 68 Ill.App.2d 70, as well as the Restatement of the Law of Torts Second, 402A.

*Garofalo v. General Motors Corp.* (1968), 103 Ill.App.2d 389, involved primarily the issue of the obligation to answer certain interrogatories and the imposition of sanctions. In passing upon that issue, the court noted the evasiveness of the answers. To hold that this is authority for the necessity of proof of a specific defect in a strict liability in tort action is contrary to *Dunham v. Vaughan & Bushnell Mfg. Co.,* 42 Ill.2d 339, and the authorities cited therein.

*Rotche v. Buick Motor Co.* (1934), 358 Ill. 507, was a negligence action whereby the manufacturer of the product became liable if the product was of such character as to be reasonably certain to cause injury

if negligently made. This, of course, has no relevancy in a strict liability in tort action.

The majority opinion also states, "Furthermore, the plaintiff was never even able to identify the bed in question." Certain pictures were identified by defendant's supervisor of engineering services as the product of the manufacturer. These were shown to the doctors who, amongst other language, called it "the exact duplicate" and indicated that on the particular incubator in question, the name Hess was printed on the top of the bed.

The record shows that notwithstanding the efforts of the father of the child to see the incubator shortly after the occurrence, this was impossible. These efforts were likewise pursued during extensive discovery procedures, but apparently the hospital did not have it. That it is unnecessary to produce the product itself is well established by *Texaco, Inc. v. McGrew Lumber Co.* (1969), 117 Ill.App.2d 351, and *Nolan v. Shaf Mfg. Co.* (1970), 128 Ill.App.2d 19.

The incubator was supposedly designed to provide a safe maximum temperature for infants using it. This incubator, however, overheated so as to dehydrate the plaintiff and cause excessive body temperature. It was without any device to prevent it from so doing, and defendant's engineer so testified. Whether such a product so designed was unreasonably dangerous was for the jury, not the court.

As to the negligence charges, it was certainly foreseeable that unless there was something to insure the "safe maximum" temperature for the infant while in the incubator, it would overheat, with the attendant ill effects upon the infant. The defendant manufacturer, by its literature, recognized this hazard but had no device on its product to guard against overheating. Whether it was negligent in so doing was an issue of fact. *Lindroth v. Walgreen Co.* (1950), 407 Ill. 121.

The plaintiff was entitled to recover some damages from the hospital. It was error, in my opinion, for the Circuit Court to direct a verdict for the manufacturer of the incubator, who may also be liable for damages. The cause should be reversed for a new trial on the issue of damages only as to the defendant Michael Reese Hospital and for a new trial on all issues as to the defendant manufacturer.