Lillian Borowicz, Jerry Borowicz, a Minor, by Gustave Borowicz, His Father and Next Friend, Catherine McCarthy and Lillian Borowicz, Administrator of the Estate of John McCarthy, Deceased, Plaintiffs-Appellees, v. Seuring Transit Company, Inc., a Corporation, and Paul Wright, Defendants-Appellants.

Gen. No. 51,914.

First District, First Division.

June 24, 1968.

Irvin Tischer, of Chicago (Sidney Z. Karasik, of counsel), for appellant.

Blumenthal and Schwartz, of Chicago (Milton M. Blumenthal and Arthur F. Schwartz, of counsel), for appellees.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action by the driver and passengers of an automobile that was struck in the rear by a tractor-trailer being driven by defendant Paul Wright for defendant Seuring Transit Company, Inc. The plaintiffs include Lillian Borowicz, who was driving her husband's automobile, and Catherine McCarthy, her mother, John McCarthy, her father, and Jerry Borowicz, her minor son. The occurrence took place on the evening of January 22, 1964.

The jury returned verdicts in favor of all plaintiffs. The primary reason for defendants' appeal is the $33,000

award in favor of Mrs. Borowicz, which defendants charge was grossly excessive.

Defendants' other contentions on appeal are: (1) The testimony of Dr. Lucatorto of alleged pathology shown on the X rays, interpreted for him in a written report of an unidentified roentgenologist, which report was not produced in evidence, was incompetent as hearsay, and should have been stricken. (2) A patient's history and statement of subjective complaints, given to an examining physician for the purpose of testifying, is incompetent evidence, and it was error to admit Dr. Smith's testimony on these matters on the pretext that he was a "treating" physician. (3) Defendants were prejudiced by the arbitrary curtailment of their examination of their medical witnesses and in not permitting defendants' exhibit 6 (a medical record) to go to the jury room.

Mrs. Borowicz testified that immediately after the occurrence, she experienced pains and stiffening in her neck; her back, left shoulder, left thigh and knee hurt, and she had bruises on her right hand. After a night of pain, she consulted with Dr. Lucatorto on January 23, 1964, the day after the occurrence. She was hospitalized for six days, where she was in bed traction for 22 hours a day and was not allowed to sit up. She received medication and diathermy treatments. When discharged from the hospital she felt no improvement in her condition. She was fitted for a surgical collar—"A surgical collar is a brace like I am wearing now." She continued under the care of Dr. Lucatorto and went to his office two or three times a week, receiving heat treatments and medication. Traction equipment was purchased for home use, and she used it at home almost every day for approximately six hours. She had seen Dr. Leonard Smith, "an orthopedic man," twice—in October of 1964 and on June 7, 1966, during the trial. She also received treatment at the Schmitz Medical Group—"I went there for a physical

because of my back and to make sure nothing else was hurting. He didn't find any other problems." At the time of the trial Mrs. Borowicz was still troubled by pain in her neck and shoulder.

Dr. Vito Lucatorto testified at length on behalf of the plaintiffs. He had been a physician and surgeon since 1938 and was engaged in general practice. Mrs. Borowicz came to his office on January 23, 1964, the day following the occurrence, and he had occasion to observe and treat her. He noticed there was limitation of motion in the head and neck, and that she experienced pain and tenderness over the paravertebral muscle in the cervical region. The neck muscles were in spasm and were hard and tender. She had bruise marks on her left shoulder, left thigh and left knee. He ordered X rays taken of her left shoulder, cervical spine and ribs. These X rays were identified by him and were admitted into evidence. He used them in his testimony. On the basis of the X-ray films and clinical examination of the patient, he made a diagnosis that Mrs. Borowicz was suffering a subluxation of the fourth vertebra over the fifth, and in addition there had been both ligamental and muscular injury to the neck; that a torn ligament or muscle heals with scar tissue which does not have the strength of the original tissue. He also identified other X rays taken of Mrs. Borowicz, which were received in evidence.

Dr. Lucatorto saw Mrs. Borowicz fifty times, the last time being on June 6, 1966 (during trial). Her remaining complaint was pain in the neck, some numbness of the left hand, and of feeling dizzy and faint after making any sudden movement toward the left. It was his opinion that the subluxation in Mrs. Borowicz's neck, the numbness and paresthesia of her left hand, the spasm of the muscles of the neck and the other conditions of ill-being which he found as recently as June 6, 1966, were permanent,

and she would require treatment for an indefinite period of time.

On cross-examination, Dr. Lucatorto testified that he was a general practitioner and not an expert at reading X rays, although he had been taught to read them in his medical training and read many in the course of his practice. Dr. Lucatorto stated: "The degree of subluxation is determined by the X-ray picture itself. I was able to determine the degree of subluxation in Mrs. Borowicz from the pictures. According to the X-rays it was very evident that the fourth cervical vertebra was pushed forward to the anterior border of the fifth cervical vertebra, its neighboring vertebra below. I would say it was moderate at the beginning."

Defendants then identified certain of their own X-ray exhibits and requested Dr. Lucatorto to read them. He asked to be allowed to read the report of the roentgenologist who made the X-ray pictures. When his request was refused, he said: "But this gives the wrong impression. I am not posing here as a recognized roentgenologist. I am a general practitioner. I am guided by the roentgenologist. If they tell me it is subluxation or possible trauma of recent origin, I believe them. Your questions are unfair." At this point the defendants' counsel stated to the court: "Your Honor, this testimony has all been hearsay." Thereafter, out of the hearing of the jury, defendants asked for a mistrial because of the witness' remark characterizing the defendants' questions as unfair. The motion for a mistrial was denied. The jury was instructed to disregard the remark.

On cross-examination later, Dr. Lucatorto stated his testimony on the X rays of Lillian Borowicz and Catherine McCarthy was based on written reports from the roentgenologist who took the X rays and placed the red marks on the X rays of Mrs. Borowicz for identification

purposes. He could read the X rays without the red marks. Dr. Lucatorto could read X rays to a "certain extent. In other words my knowledge of X-ray reading is sufficient. I knew enough about it. I am not an expert on it, but certain things I know."

After further cross-examination as to the X-ray reports, counsel for plaintiffs stated: "I respectfully submit the witness testified he has the roentgenologist's report in writing which he is prepared to produce." Counsel for the defendants replied: "I don't want to see them. . . . They are not in evidence, they can't go in evidence." Also, Dr. Lucatorto said: "I merely was stating the X-ray report of the roentgenologist. . . . This is the roentgenologist's opinion." Counsel for defendants then said: "It is not yours, is that right, sir?" At this point the court said: "Is it yours or not, Doctor? . . . After looking at it, is it your opinion?", and Dr. Lucatorto replied: "It is mine also."

Considered first is defendants' contention that the testimony of Dr. Lucatorto of the alleged pathology shown on the X rays was hearsay and should have been excluded because it was the mere recitation by him of the findings contained in a written report of an unidentified roentgenologist, which report was used extensively in his testimony and was not introduced into evidence.

Defendants argue that although Dr. Lucatorto professed some competence in the reading of X rays, the record demonstrates "that he was almost entirely dependent upon the non-present roentgenologist for the conclusions that he gave at the trial—even to the extent of requiring a red mark on the X-rays to assist him in locating the alleged pathology." Defendants' authorities on this point include an article in 54 IBJ, p 910, headed "The Consulting Specialist: A Necessary or Unnecessary Witness?" (June 1966.) There it is said:

"The Smith exception to the Hearsay Rule [46 Ill App2d 117] should be available in all cases where (1) the physician takes an active role in the examination and testing conducted by the specialist, (2) the physician personally diagnoses the ailment, or concurs in the specialist's diagnosis, (3) the physician does not merely read from the report of the consultant, and (4) the tests and the reports which are the basis of the diagnosis are admitted in evidence."

Defendants argue that the testimony of Dr. Lucatorto did not meet these guidelines, and that element (4) (the X-ray reports) definitely is not present.

Plaintiffs contend that Dr. Lucatorto read the X rays on direct examination and gave his medical interpretation of them. "The fact that he was assisted by the report of the roentgenologist in arriving at his conclusions did not make his testimony inadmissible. The X-rays were in evidence and counsel for the Defendants had the opportunity to cross-examine the doctor on his findings and to dispute and question his diagnosis."

Although Dr. Lucatorto used the written X-ray reports of the roentgenologist in describing the pathology revealed by the X rays, defendants' counsel rejected the offer to produce the reports. This was sufficient, and plaintiffs were not required to offer the reports in evidence. The record also shows that Dr. Lucatorto's X-ray diagnosis of Mrs. Borowicz's cervical spine was confirmed by Dr. Leonard Smith, who testified for the plaintiffs, and by defendants' medical witness, Dr. John C. Thill. If the X rays in evidence had not supported Dr. Lucatorto's testimony, defendants' witnesses would have contradicted him.

■ We conclude that the testimony of Dr. Lucatorto as to the cervical area pathology of Mrs. Borowicz, as revealed by the X rays in evidence, comes within the

guidelines of Smith v. Broscheid, 46 Ill App2d 117, 124, 196 NE2d 380 (1964), and Hickey v. Chicago Transit Authority, 52 Ill App2d 132, 139, 201 NE2d 742 (1964). No error was committed in permitting the X-ray testimony of Dr. Lucatorto to stand.

Defendants' next contention concerns the testimony of Dr. Leonard R. Smith, a specialist in orthopedic surgery, who examined Mrs. Borowicz twice—on October 9, 1964, and during the trial on June 7, 1966.

Dr. Smith testified that on October 9, 1964, he took "a clinical history" from Mrs. Borowicz and also performed "an objective examination." Over objection he recited the history of the occurrence as related to him by Mrs. Borowicz. From a physical examination of Mrs. Borowicz and use of X rays, he made a diagnosis that she had incurred "a hyperextension, hyperflexion injury involving the cervical spine. That means, designates the direction or force of the type of injury; with the head being thrown back, that is hyperextension; and flexion, there is a tearing of the ligaments and muscles—particularly the posterior ligaments at C–4, C–5—which prevent the vertebrae from shifting. So, as a result of the tearing of the ligament—this level, the vertebra was thrown, pushed forward, producing the subluxation of C–4 upon C–5—this produces the narrowing of the posterior intervertebral foramen, with resulting impingement on the nerve roots—C–5, particularly on the left. There is also, of course, attendant soft tissue injuries of the muscles and other ligaments; but, this primarily is the basic injury."

At the October 1964 examination, Dr. Smith "reviewed what had been done before" and recommended the use of a "Jackson cervical pillow at night—which would immobilize the neck at night—rather than using a collar, which is extremely uncomfortable to sleep with."

The June 7, 1966, examination of Mrs. Borowicz consisted of "obtaining a history and objective examination,

334

and radiographic examination or X-ray examination." Over objection he was permitted to testify "what the examination disclosed, both subjectively and objectively." With the exception of the additional complaint of "some lightheadedness and occasional dizziness" and "the fact that the limitation of motion and extension was now twenty degrees as compared to ten degrees before, indicating the progression of the limitation and extension," the findings were essentially the same as those reported on October 9, 1964. In his opinion there was a causal connection between the subluxation and the seizures of lightheadedness and dizziness. Over objections, the doctor was permitted to give the reasons for his opinion.

On June 7, 1966, Dr. Smith prescribed treatment for Mrs. Borowicz, "Simply that she continue doing what she has been doing in the past, that also, in the future, if her symptoms persist, then it may be necessary to fuse these vertebra. . . . To continue with the collar, to continue with the cervical pillow, to continue with the traction, to apply heat, to get additional physical therapy whenever the muscle spasm increases, to take appropriate medication for the relief of pain and muscle spasm whenever it reoccurs." On cross-examination, it was his opinion that "the physical condition of Lillian Borowicz which I have described is permanent. The reason for my opinion is the nature of the injury, the length of time which has elapsed since the injury and the present findings."

Defendants contend that it was error to admit Dr. Smith's testimony on Mrs. Borowicz's history and statement of subjective complaints. Defendants assert that if a physician "is only an examining doctor he is permitted to testify only as to his objective findings and may not mention the patient's subjective complaints or history of accident." Defendants cite Jensen v. Elgin, J. & E. Ry. Co., 24 Ill2d 383, 182 NE2d 211 (1962), where it is said (p 388) :

"Statements of pain and symptoms are admissible as an exception to the hearsay rule, if made by a patient to a physician for purpose of diagnosis and treatment, on the theory that the desire for proper treatment outweighs any motive to falsify. . . . Since the cause of an injury may be a factor in diagnosis, statements of the cause of an injury or condition have been held admissible because they also fall within the guarantee of truthfulness. . . . Evidence of statements and physical demonstration capable of simulation are not admissible, however, if made to a physician examining for the purpose of testifying, and he is limited to testifying to purely objective conditions."

Plaintiffs argue that Dr. Smith was a treating physician because he recommended the use of the Jackson surgical pillow, and that his testimony was therefore an exception to the hearsay rule. Plaintiffs cite Jurney v. Lebeznik, 72 Ill App2d 117, 218 NE2d 799 (1966), where there was a recommendation of a shoe lift by the examining physician.

It is our opinion that there may be a serious question as to whether Dr. Smith should have been considered a "treating physician" here. However, there was no dispute as to the facts of the collision, and his testimony of plaintiff's subjective symptoms added very little to the evidence properly in the record. We find no prejudicial error here.

Defendants also assert that it was error to permit Dr. Smith to read into the record the history and subjective complaints of Mrs. Borowicz from his personal notes, which were not identified or introduced into evidence. The record indicates that, although defendants moved to strike this part of Dr. Smith's testimony, no specific objection was made to his use of his notes. In the absence of a proper objection, we consider this point waived.

336

We consider next defendants' contention that defendants were prejudiced by the arbitrary curtailment of their examination of their medical witnesses and in not permitting defendants' exhibit 6 to go to the jury room.

Three members of the Schmitz Medical Group were called as witnesses by the defendants—Dr. Peter Nelson, a cancer specialist, and Charles J. Smith and William Gordon, gynecologists and specialists in medical problems peculiar to women. Mrs. Borowicz was treated from time to time by the Group for conditions not related to the occurrence. On April 7, 1964, she was treated for varicose veins. Parts of her body involved in her occurrence complaints were the subject of entries in her medical record (defendants' exhibit 6). The three doctors were permitted to testify freely as to their personal findings. Defendants' counsel sought to examine the three doctors about entries and symbols on exhibit 6. There were seven doctors at the clinic and notations were made on exhibit 6 by the doctor who administered the treatment. Some of the handwriting was not identified. The court properly sustained objections to questions which sought evidence which was immaterial, irrelevant or improper. We find defendants' contention of curtailment of the examination of these witnesses to be without merit.

Defendants argue that the court's denial of defendants' request to send defendants' exhibit 6 to the jury room was unreasonable and arbitrary and an abuse of the court's discretion. Defendants assert that "the appearance of a zero '0' after 'neck' in the entry of April 7, 1964 was of great probative significance, and the jury should have been permitted to visualize that entry." We find no merit in this contention. In our opinion, it would have been improper and fundamentally unfair to Mrs. Borowicz to permit exhibit 6 to go to the jury in this case.

Defendants also contend that the examination of Dr. John C. Thill was limited. Dr. Thill examined Mrs.

337

Borowicz at the request of defendants on January 5, 1966, and he took her history. Dr. Thill testified at length as to his examination of Mrs. Borowicz and observed some limitation of neck movements. X-ray films were taken by Dr. Hussey, a roentgenologist. Both doctors read the X rays. There was a forward displacement of the fourth cervical vertebra in relation to the fifth, and Dr. Thill classified it as a very "slight subluxation," and he could not tell whether it was an old or new one. Objections were sustained to questions involving soft tissues, "tearing of ligaments," and other conditions not observable from the X-ray films. We find no abuse of discretion in the court's ruling here.

Finally, defendants contend that the $33,000 award for injuries to Mrs. Borowicz was grossly excessive, especially since she sustained no loss of past or future earnings and her special damages were approximately $900.

At the time of the occurrence, Mrs. Borowicz was 48 years of age and had a life expectancy of 27.7 years. She testified that since the occurrence she was unable to "iron, wash, scrub or do heavy work. I hire somebody to do this work." Also, she was unable to swim, bowl, golf and dance, all of which she had done formerly. She had become highly irritable, she felt like an invalid. The medical testimony showed that the condition of her neck and left hand were permanent, and that she would require treatment for an indefinite period of time.

 Although it is true that the verdict for Mrs. Borowicz is large in comparison to her expenses, the assessment of damages is the preeminent function of the jury. Each verdict for a personal injury must be examined in the light of the particular injury involved, and the record should be examined to determine whether the amount of the verdict is so large as to indicate passion and prejudice. Considering the medical testimony and plaintiff's testimony of pain and suffering and her life

expectancy, we think the verdict is within the scope of the evidence. It is not so clearly excessive as to require this court to disturb it. Lau v. West Towns Bus Co., 16 Ill2d 442, 452, 158 NE2d 63 (1959); Smith v. Broscheid, 46 Ill App2d 117, 126, 196 NE2d 380.

We conclude the instant trial was free from prejudicial trial errors, and for the reasons given the judgment is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.