RICHARD McKASSON, Plaintiff-Appellee, *v.* ZIMMER MANUFACTURING COMPANY *et al.*, Defendants-Appellants.

(No. 72-62;

Second District—June 8, 1973.

*Rehearing denied July 26, 1973.*

430

432

Lord, Bissell & Brook, of Chicago, for appellants.

Maynard & Brassfield, of Rockford, for appellee.

Mr. JUSTICE THOMAS J. MORAN ·delivered the opinion of the court:

This products liability action was initiated against the manufacturer and distributor of a certain surgical pin known as a Schneider intramedullary rod. Injuries were allegedly sustained due to a break in one of defendants' rods which had been implanted in plaintiff's left femur. The jury awarded plaintiff a verdict of $175,000 and defendants appeal from the judgment entered thereon.

Defendants seek reversal based upon the following averred errors: (1) absence of evidence of a manufacturing defect in the rod which could have caused it to break; (2) the trial court's refusal of an instruction on misuse, and its allowing argument by plaintiff's counsel as if misuse was not an issue; (3) the court's rejection of defendants' evidence on testing methods; (4) newspaper accounts having been read by three jurors; (5) prejudicial remarks by plaintiff's counsel during closing argument; (6) giving of an instruction regarding plaintiff's right to recover for disability and disfigurement, and argument by plaintiff's counsel for such damages; (7) testimony by plaintiff that he had a wife and three children; (8) excessiveness of the verdict; (9) the cumulative effect of errors.

The stainless steel rod in question is designed for insertion into a fractured bone to provide support and stabilization during the healing process. On October 27, 1965, plaintiff underwent surgery to repair a comminuted fracture of the left femur; a rod was employed to hold the bone fragments in proper alignment.

Plaintiff remained in a wheel chair for approximately six months after surgery, and was then permitted to place partial weight on the affected leg, first while using a single crutch and, later, a cane. In August, 1966,

still using a cane, plaintiff returned to work on a part time basis. X-rays taken throughout this period, including one taken on January 25, 1967, disclosed progressive healing of the fracture (although not complete union), and showed the rod in proper position. A March 21, 1967, x-ray, however, revealed a break in the rod which, according to one of the doctors, had probably occurred several days earlier.

Plaintiff was referred to another doctor who advised additional surgical intervention to promote the healing process which had been disrupted by the breaking of the intramedullary rod. Plaintiff underwent a second surgery on the left femur on May 3, 1967. A Phemister barrel stave operation, a type of bone graft, was performed. For some time thereafter it seemed that the operation had been successful but, after about eight months, the healing process seemed to have slowed. It was determined that the bone was not mending properly, due, at least in part, to the presence of excessive scar tissue.

In July, 1968, plaintiff went under the care of a third orthopedic surgeon who performed a compression plate operation on September 20, 1968. After that operation, plaintiff was first restricted to a wheel chair, graduated to crutches, then to one crutch until April 29, 1969, when the doctor, having determined that the fracture was solidly healed, permitted plaintiff to walk without crutch support.

I. Evidence of Defect

Defendants contend that the trial court erred in failing to direct a verdict in their favor claiming there was no evidence that the break in the rod was caused by a defect in its manufacture, arguing that all of plaintiff's witnesses agreed with defendants' own expert that the rod broke as a result of fatigue failure. (Fatigue failure is the result of metal being subjected to alternate loading in excess of its endurance limit).

Plaintiff's evidence on this issue consisted of the testimony of two metallurgists and a mechanical engineer. The metallurgists' analyses revealed the presence of various imperfections in the rod, including a small crack about a quarter-inch from the break, pitting on its surface, and inclusions (foreign objects in the steel). Their testimony indicated that any of these imperfections could have existed at the time the rod left the manufacturer; that their presence could initiate a crack in the metal and create areas of stress concentration, weakening the metal so that fatigue failure would occur at a stage considerably below the ordinarily anticipated endurance level. It was the opinion of both metallurgists that, if the rod was properly designed for implant in the human body and not bent prior to use, the failure resulted from a defect which existed at the time of manufacture. The mechanical engineer took measurements

of the rod and of plaintiff, ascertained weight distribution and determined stress placed upon the rod in walking and in rising from a sitting position. Given the tensile strength of the rod and its endurance limit, the rod, in his opinion, could not have fractured unless a defect existed.

Defendants' expert, qualified both in the fields of metallurgy and mechanical engineering, testified that fracture of the rod occurred as a result of fatigue failure. His extensive research in the field of implants had shown that because maximum stress occurs at the point of non-union of the bone, fatigue failure of the implant commonly occurs at that same point. It was this witness' opinion that the computations of plaintiff's expert were inaccurate because, in determining the endurance limit of the implanted rod, consideration had not been afforded the additional stresses brought by muscle pull which, in his experience, can surpass the stresses of bodily weight. He further testified that no defect existed in the rod, its failure, rather, resulting from the stress of a cyclic load over an extended period of time in the area of non-union of the bone.

The testimony, thus summarized, does show (in accordance with defendants' argument) that all experts agreed that the rod ultimately broke as the result of fatigue failure. This mutual conclusion, however, fails to obviate the disparity of opinion over the very cause of this particular fatigue failure. Plaintiff's witnesses contend that the failure was due to defect, defendants' witness, that it was due to undue stress. These opposing theories merely presented a question of fact for the jury's determination.

■■■ Under the rule of *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 623 (1965), a plaintiff in a strict liability action must prove an injury resulting from an unreasonably dangerous condition of the product which existed at the time it left the manufacturer's control. (*Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill. 2d 339, 342 (1969).) Since there was sufficient evidence to substantiate the presence of defects at the time the rod was analyzed and since evidence also supported the conclusion that defects contribute to fatigue failure, the jury could infer that the defects were present at the time of manufacture and that, in the instant case, the failure occurred as a direct result. The evidence defeats defendants' contention that they were entitled to a directed verdict. See, *Spotz v. Up-Right, Inc.*, 3 Ill.App.3d 1065, 1073 (1972); *Taylor v. The Carborundum Co.*, 107 Ill.App.2d 12, 19-20 (1969); *Sweeney v. Matthews*, 95 Ill.App.2d 6, 14-16 (1968), aff'd. 46 Ill.2d 64 (1970).

II. Misuse Defense

Defendants assert error in the refusal of their tendered instruction

which, in relevant part, directed the jury to find for defendants if "plaintiff failed to follow the instructions of his doctor as to the use and function of an intramedullary rod  *  *  *."

■■■ The rule is that misuse is a valid defense to an action based upon strict liability. (*Williams v. Brown Mfg. Co.*, 45 Ill.2d 418, 425 (1970).) There is also a rule that it is not error for a court to refuse an instruction when there is no evidentiary basis for that instruction. (*Woods v. C., B. & Q. R.R. Co.*, 306 Ill. 217, 221 (1923); *Darby v. Checker Co.*, 6 Ill.App.3d 188, 196 (1972); *Elliston v. Hunsinger*, 8 Ill. App.3d 1068, 1070 (1972).) In the present case, there was no evidence that the doctor ever spoke to plaintiff concerning the rod; his instructions merely directed the use of caution with respect to the degree of weight to be put on the leg, a caution which, evidence indicates, plaintiff heeded.

■■ Having found no evidence in the record on which an instruction on misuse could have been based, it necessarily follows that there was no error in argument by plaintiff's counsel to the same effect.

III. Testing Methods

■■■ Defendants attempted to introduce evidence to establish that each rod, before leaving the factory, was subjected to a test for defects. This evidence was refused by the trial court. Defendants assert that this evidence was particularly important in light of plaintiff's evidence that a similar test was used to detect cracks in the rod after its removal from plaintiff's leg.

Defendants cite cases from other jurisdictions which allow evidence of such testing methods but, under Illinois law, such evidence is not admissible in strict liability cases. (*Cunningham v. MacNeal Memorial Hosp.*, 47 Ill.2d 443 (1970); *Taylor v. Carborundum Co., supra*, at pp. 25-26.) The rationale of those decisions is that evidence of such testing is probative of the degree of care exercised by the manufacturer, an appropriate issue in an ordinary negligence action, but irrelevant in an action based upon the theory of strict liability.

IV. Newspaper Accounts

Defendants complain that local newspaper articles evidenced prejudicial inaccuracies. In restating the testimony of plaintiff's two metallurgists, the news articles reported: the rod was inserted "to replace part of the femur," whereas it was merely supportive; that the experts testified to the rod having "snapped," that it was "too brittle," and "not of the quality necessary for replacing a large supportive structure," while these words were not used in testimony; and that "the dye penetrant test showed defects in the rod," whereas the test merely showed a crack, not other defects.

On the morning following publication of the articles, defendants

brought them to the attention of the court and moved for a mistrial. The judge inquired whether any of the jurors had read the items; upon ascertaining that three had, and directing itself to those three, the court asked whether they could try the case solely on the evidence heard in the courtroom, absolutely disregarding the newspaper stories. All three jurors replied in the affirmative and the court admonished them in this manner:

> "All right. We are in a situation where the Court is trying to protect the case, and I know you wouldn't try any case  *  *  * based on what you read in any publication."

The trial then proceeded.

Defendants first contend the articles were so inherently prejudicial that a mistrial should have been declared whether or not the jury members admitted seeing them.

■■■ It is primarily the duty of the trial court, in the exercise of its discretion, to determine whether publication of allegedly prejudicial statements has interfered with the right to a fair trial. The most important consideration in this determination is the character of the prejudicial material. (*People v. Keegan*, 52 Ill.2d 147, 155 (1971), *cert. den.*, 406 U.S. 964, 32 L. Ed. 2d 663, 92 S. Ct. 2408 (1972).) The present case is not one in which facts not in evidence were brought to the jury's attention through a newspaper article. Rather, these reports summarized facts already in evidence, and we are not persuaded that the accounts were grossly inaccurate. The descriptions of the rod as brittle, having snapped, and being of inadequate quality, were attempts to report the expert testimony in layman's terms. That the rod was incorrectly described as a bone replacement, and the dye penetrant test mistakenly identified as the means by which all defects were detected, did not prejudice defendants' case since, as noted by the trial court, a juror would be able to recognize the difference between a reporter's version of the facts and those presented in court. The court did not abuse its discretion in denying the motion for mistrial.

■■ Defendants also contend that the trial court failed to conduct a meaningful examination of the jurors who had read the articles. As authority, defendants cite *People v. Cain*, 36 Ill.2d 589 (1967), where the Supreme Court, noting the unquestionably prejudicial nature of the newspaper accounts there involved, held that the trial court had not taken adequate steps to protect defendant's rights. In the instant case, unlike *Cain*, the interrogation of the jurors by the judge was fair. The court objectively questioned the jurors on whether they had been affected by the articles, did not attempt to elicit particular responses, admonished the jurors not to try the case based on anything read in publications,

and properly instructed the jury to decide the case from evidence produced in open court. We find no abuse of discretion in the court's handling of this matter. See, *People v. Malmenato*, 14 Ill.2d 52, 63-65 (1958), *cert. den.*, 358 U.S. 899, 3 L. Ed. 2d 148, 79 S. Ct. 222 (1958); *People v. Yocum*, 122 Ill.App.2d 126, 134-136 (1970).

V. Statements by Plaintiff's Counsel in Closing Argument

Defendants first assert that plaintiff's attorney was allowed to convey to the jury the impression that it would not be deciding the case unless the court felt there was sufficient evidence to support plaintiff's position.

In closing argument, defendants' attorney stated that there was no evidence to support plaintiff's claim of rod defect. In rebuttal, plaintiff's counsel remarked, "If that were true, you wouldn't even be deciding the case." The defense objected, and the judge stated, "* * * the Court cannot comment on the evidence and the jury will have to determine what was said during the course of this trial and in the arguments."

■■ Defendants bring to our attention decisions of other jurisdictions, disapproving a counsel's representation of the court's opinion to the jury, *e.g.*, *Sanchez v. Stremel*, 95 Ariz. 392, 391 P.2d 557 (S.Ct.Ariz. 1964); *Tucker v. Newth*, 157 S.W. 2d 1010 (Ct. of Civ. Apps. of Tex., 1941); *McGowan v. Wells*, 24 S.W. 2d 633 (S. Ct. Mo., 1929). We do not reach the question of the appropriateness of the law cited, since we do not view the remark of plaintiff's attorney as being a representation of the court's opinion, but merely an assertion of disagreement with defendants' argument that there was no evidence of the existence of a defect. The court's response to the objection clearly stated that it held no opinion on the evidence. In the context of the complete arguments, we cannot conclude that the jury could in any way interpret the remarks of plaintiff's counsel as being reflective of the court's opinion of the evidence.

Defendants allege that plaintiff's attorney repeatedly misrepresented the burden of proof in a products liability action, pointing to three sections of argument wherein, they contend, counsel indicated plaintiff merely had to show that the rod broke and injury resulted.

■■ Having reviewed the closing arguments, we find no merit in defendants' contention. From the context of the arguments, it was clear to the jury that plaintiff had the burden of proving both that the rod was defective at the time it left the manufacturer's control, and that the defect resulted in plaintiff's injury. The jury was correctly instructed as to the burden of proof and the proper elements necessary to establish an action for strict liability.

VI. Issue of Disability and Disfigurement

Defendants assert that evidence failed to establish that plaintiff's

disability and disfigurement resulted from the break in the intramedullary rod rather than from the original femur fracture or its failure to heal properly. They argue error in the court's instruction to the jury that plaintiff could recover for disability and disfigurement, and in the court allowing plaintiff's attorney to argue this element of damages in his closing argument.

X-rays taken from the time following the first operation until the time just prior to the breaking of the rod, indicated that progressive healing of the fractured femur had taken place. Uncontradicted was plaintiff's testimony that, after the third operation, it was prescribed that the shoe for his left foot be built up approximately two inches, and that at no time prior to the breaking of the rod and the subsequent surgery was he required to wear a built-up shoe. Surgeons who performed the two operations subsequent to the breaking of the rod, testified that it was necessary to cut down or remove portions of the bone for the purpose of bone grafting. The surgeon who performed the last operation explained that he usually takes bone grafts from the same side he is repairing so as not to cripple both legs.

■■ We hold that there was sufficient evidence from which the jury could infer that plaintiff suffered a two-inch shortening of his left leg as a result of bone grafting during the second and third operations and that these operations were necessitated by the breaking of the rod rather than by improper healing of the fractured femur. There is no question but that a two-inch shortening of the leg constitutes "disability and disfigurement." We conclude that it was not error to argue or to instruct on this point.

VII. Evidence of Domestic Circumstances

Defendants complain of two segments of plaintiff's testimony which related to his family.

On direct examination, plaintiff was asked if he were married at the time he returned home after the initial surgery. He answered affirmatively, and was then asked his wife's name, which he gave. The defense did not object. He was next asked how many children he had and, at that point, an objection was entered. The court asked if counsel wanted to be heard in chambers, but defense declined. The court then overruled the objection and plaintiff replied that he had three children.

■■ The rule is that evidence of marriage and number of dependents is irrelevant in a suit for personal injuries. If there has been undue emphasis, if it appears the trial court abused its discretion, or if the jury has been affected by such evidence, reversal will result. (*Payne v. Noles*, 5 Ill.App.3d 433, 438 (1972); *Walsh v. Dream Builders, Inc.*, 129 Ill.App.2d 280, 293 (1970); *Brayfield v. Johnson*, 62 Ill.App.2d 59,

64-65 (1965).) In the present case, there was no objection to plaintiff's testimony regarding the fact that he was married, and defendants are precluded from raising the issue on appeal. Although defendants did object to testimony regarding the number of plaintiff's children, they refused the court's invitation to be heard on the matter in chambers. This evidence was presented at an early stage of the trial when the court could not determine what relevancy it might have, yet the defense refused to explain its position. Under these circumstances, the court did not abuse its discretion in overruling the objection, and it cannot be said that the evidence was unduly emphasized so as to arouse the sympathies of the jury.

Defendants assert that certain testimony, elicited during direct examination of plaintiff, magnified the prejudice resulting from the evidence of his domestic circumstances.

■■ In answer to his attorney's question regarding a certain incident, plaintiff began to answer, "My wife collapsed  *   *   *" At that point, responding to defense's indicated request, the court directed counsel to be heard in chambers. Plaintiff's attorney explained that he wanted to show that plaintiff had remained helpless in his wheel chair although his wife had collapsed before him; that this information was for the purpose of establishing his client's credibility in light of certain implications, made during defense's cross-examination, that plaintiff had indiscriminately walked on his leg without supportive aid. Stating that the prejudicial impact of the testimony tended to outweigh its probative value, the court sustained the objection. No request was made to have the jury disregard the remark. Despite the court's sustained objection, it is argued that the utterance was of such a nature as to prejudice the jury. We find no merit to this claim.

VIII. Excessiveness of Verdict

It is contended that the amount of the verdict ($175,000) was the result of the jury's emotions—sympathy for the plaintiff and prejudice against defendants. In support of this claim, defendants first compare the special damages proved (approximately $16,000) with the jury's award, and then argue that plaintiff's evidence as to pain and suffering was insufficient to sustain the difference. Because of their former contention, they do not include the element of disability or disfigurement resulting from the injury.

■■■ The issue of damages is to be resolved by the jury and its determination will not be upset unless so excessive as to indicate it was influenced by passion or prejudice. (*Lau v. West Towns Bus Co.*, 16 Ill.2d 442, 453 (1959).) The test of excessiveness, however, cannot be solely a comparison between the verdict and the special damages in-

curred; each verdict must be examined both with regard to the injury involved and with deference to the jury's discretion. *Lau v. West Towns Bus Co., supra.*

■■ A review of the evidence herein shows that, at the time of trial, plaintiff was a thirty-four year old man who, as a result of the breaking of the intramedullary rod, incurred various medical expenses and loss of salary; that he was subjected to two additional operations on his injured leg with attendant pain; that he suffered permanent shortening of his leg resulting in disability and disfigurement. The jury could also consider the special effect which this disability might have on this particular plaintiff who, at some time prior, had lost an arm. (See, *Noncek v. Ram Tool Corp.*, 129 Ill.App.2d 320, 331 (1970); *Parnham v. Carl W. Linder Co.*, 36 Ill.App.2d 224, 236 (1962).) Having reviewed the record, we are not prepared to say that the verdict was excessive. See, *Lau v. West Town Bus Co., supra; Fortner v. McDermott*, 1 Ill.App. 3d 358, 368-370 (1971); *Stephenson v. Air Products & Chemicals, Inc.*, 114 Ill.App.2d 124, 138 (1969); *Blyzes v. Midwest Towing Co., Inc.*, 109 Ill.App.2d 48, 55-56 (1969).

Due to the conclusions already reached, we find it unnecessary to respond to defendants' last assigned error.

For the reasons stated herein, the judgment of the trial court is affirmed.

Judgment affirmed.

GUILD, P. J., and SWANSON, J., concur.