VITO SAPUTO, Plaintiff-Appellant, *v.* JEROME FATLA, d/b/a JERRY'S SHELL SERVICE, *et al.*, Defendants-Appellees.

(No. 58611;

First District (2nd Division)—January 28, 1975.

*Rehearing denied February 25, 1975.*

Baker & McKenzie, of Chicago (Francis D. Morrissey and Thomas F. Tobin, of counsel), for appellant.

Pretzel, Stouffer, Nolan & Rooney, of Chicago (Joseph B. Lederleitner, of counsel), for appellees.

Mr. JUSTICE STAMOS delivered the opinion of the court:

This action was brought by plaintiff, Vito Saputo, against defendants, Jerome Fatla, d/b/a Jerry's Shell Service, and Shell Oil Company (hereinafter Shell), for injuries sustained when plaintiff allegedly fell in the restroom of a gasoline station owned and operated by defendants. The jury returned a verdict in favor of both defendants and judgment was entered thereon. On appeal, plaintiff does not contend that the verdict is against the manifest weight of the evidence, but argues that numerous evidentiary and instructional errors deprived him of a fair trial. At trial, the following evidence was adduced:

The plaintiff, Vito Saputo, testified that in 1965 he was a sales representative for a garment-dying and -cleaning service, and operated a pick-up and delivery service which required him to drive approximately 1500 miles a week. In November of 1965, he attended the State Cleaners and Dyers Convention in Chicago. The convention concluded on a Sunday, November 28, 1965, and he departed for his home in Springfield, Illinois about 2 P.M. After proceeding on the Stevenson Expressway for

a short time, he exited to purchase gas. He drove into the Shell station in question and, after directing the attendant to fill the tank with gas, proceeded to the men's room.

Plaintiff stated that he opened the door of the washroom and, seeing that it was dark, stepped inside reaching for the light switch at the same time. Just inside the washroom, his foot slipped causing him to fall on his buttocks and back. He stated that there was three-quarters of an inch of water on the floor and that it was a little slimy as though it had been there for a while. Water was overflowing from the toilet bowl and the top of the tank was off and resting on the side. He arose and walked to the front of the station for a rag to wipe his hands and told the attendant that he had fallen and that the restroom floor was covered with water. He further stated that he made no specific complaint of injury at that time.

After leaving the station, plaintiff proceeded home to Springfield and felt the pain getting worse along the way. When he arrived home, he called his doctor who prescribed some pain pills.[1] The following day he contacted Dr. Zaricznyj who sent him to a hospital for treatment. He was placed in traction and remained in the hospital for 2 weeks. After he was released from the hospital he was unable to return to work and hired a man to work his route from December 1965 to August 1966. During this time, he went to Mayo Clinic where he was examined by several doctors and a spinal fusion was performed upon him. When he returned to Springfield, his doctor advised him not to return to work.

Plaintiff resumed his route in October of 1966, and continued at his employment until 1969. At that time, the pain became unbearable, and he was unable to continue his employment. Plaintiff stated that his physical condition at the time of trial was "all right," although he could not engage in all the physical activities that he did prior to the incident on November 28, 1935.

Thomas McDuff testified, under section 60,[2] that he was employed by Shell as a district engineer. He stated that there were no records of any washroom repairs in 1965 because day-to-day maintenance records are kept for only 3 years. The witness further stated that the lease and dealer sales agreement are the two documents that control the operation of the business between the operator and Shell. Under the dealer sales

---

[1] At this point, plaintiff testified that he had injured his back previously. In 1959 he had "popped" his back while helping his friend move a freezer and in 1963 he fell from a tree injuring his back.

[2] Ill. Rev. Stat. 1973, ch. 110, par. 60.

agreement, the obligation for maintenance and repair of station facilities was placed upon the station operator, but in practice Shell assumed responsibility for maintenance and repair of station equipment and facilities.

The witness explained that the average toilet is designed on a trap principle. Water can be poured continuously into an open bowl and as long as it does not exceed the cap of the drain pipe, the water will continue to carry away. An overflow will occur only when there is an obstruction in the toilet itself, a break in the bowl, or when the plunger that keeps the water in the tank is jammed closed.

Jerome Fatla testified pursuant to section 60 that he operated the Shell station in question. On November 28, 1965, he worked from 8 A.M. until 1:30 P.M., when he was relieved by his employee, Emil Understall. Upon his return to the station, at about 5 or 5:30 in the afternoon, he noticed an "out of order" sign on the restroom door. Water was running out from under the door. Inside he observed that water was collecting on the floor, that the commode cover was placed on the seat, that the stopper was forced back, and that water was overflowing the seat. He pulled the stopper around so that it would go back into the hole in the bottom of the cabinet. He then pulled the flap causing the overflow to stop. The toilet was flushed and it subsequently operated properly. In his opinion, the only thing wrong with the toilet was that the stopper was forced back so that it was not properly seated in the hole. After resetting the stopper, the witness mopped up the water in the restroom; he did not use a cleaner of any sort because the water was absolutely clear. The restroom was then returned to public use.

The witness stated that there was no particular time when the washrooms were cleaned, but that he had cleaned the washroom floor immediately before he left for home that afternoon at 1:30. He did not use a solvent or a cleaner when he mopped the washroom floor at that time. It was not his experience to find oil, grease or gasoline on the floor.

Shell did all the maintenance of equipment and he would call them for plumbing repairs. In July or August of 1965, Shell was called to repair some plumbing at the station. There was a problem with the field, but not with the washrooms. Approximately once a week, Shell would have a man come out and check the washrooms. At times there were special contests for the cleanliness of stations.

On cross-examination, Mr. Fatla testified, over objection, that his cleanliness program did very well and he received several awards for his operations.

Testifying on his own behalf, the witness stated that the first time he

was aware of Mr. Saputo's complaint that he had fallen in the washroom was a couple of days after the alleged incident when he received a letter from either Mr. Saputo or his attorney.

Thomas Null testified that in 1965 he was employed as a gas station attendant by defendant Fatla and on November 28, 1965, he worked at the station from 1:30 P.M. to midnight. No one complained to him of having fallen in a washroom, nor did he observe anyone with soiled or wet clothes while leaving the washroom area. His first knowledge concerning any fall was approximately a week later when his employer questioned him about it.

Emil Understall was also employed by defendant Fatla on the day in question. At approximately 2 in the afternoon, a gentleman informed him that the washroom was wet. This person did not say anything about his clothes being wet, he did not complain that he had fallen on the floor, nor did he complain of any injury. After filling up the gentleman's vehicle with gas, the witness went to look at the washroom. He saw some water on the floor as though someone had tampered with the handle or float. He then locked the door and put an out-of-order sign on it. The witness identified his initials on a gas receipt which had been issued to plaintiff on the day in question.

The medical testimony consisted of the evidence depositions of Dr. Zaricznyj, Dr. Bostrom, and Dr. Peterson, and the testimony of Dr. Hirschtick.

Dr. Zaricznyj testified that he was a certified orthopedic surgeon and had first treated the plaintiff in 1963 for injuries sustained in falling off a ladder. The patient had previously consulted a Dr. Woody. He was treated with physical therapy but developed severe pain and numbness in the upper extremities. Five weeks before he saw the witness in 1963, the patient had been referred to a Dr. Hayner who diagnosed a cervical disc problem and performed surgery. Upon examining the patient, the witness stated that he had no pain in the neck but was complaining of pain in the low back. Based upon his examination and findings, the doctor concluded that the patient did not have a ruptured disc, but suffered from a lumbo-sacral sprain. The doctor prescribed a lumbo-sacral corset and physical exercises. The patient requested to be admitted to the hospital for traction, but the doctor did not do so.

The doctor next saw the patient on November 30, 1965. The patient related that he had fallen down 2 days previously and had landed hard on his buttocks. He developed severe pain in the low back which radiated down to his legs. The doctor stated that the medical significance of the fact that the patient spoke of the pain as radiating through his legs was that it indicated an irritation of the nerve roots in the low back.

The witness also conducted a medical examination of the patient. X-rays revealed a narrowing of the disc space between L-5 and S-1 which was not present in the 1963 X-rays. He diagnosed plaintiff's condition as a herniated disc.

Dr. Bostrom testified that he is a consultant in neurology at Mayo Clinic and conducted a neurological examination of plaintiff in 1966. His history indicated that plaintiff's low-back complaints began 6 years earlier when he lifted a freezer. During the examination, the doctor stated that plaintiff overreacted, giving excessive responses to what was done to him. From a neurological point of view, Mr. Saputo was normal.

Dr. Peterson of Mayo Clinic testified that he is a specialist in orthopedic surgery and first treated the plaintiff in January of 1966. His history noted that plaintiff had back difficulty for many years; that he had a low-back injury while lifting a freezer some years ago; that he had fallen on a wet floor in a restroom; and that his back pain was much more severe the following day.

During the time plaintiff was at Mayo Clinic, the witness and a Dr. Svien operated on the patient. The operation was described as "a left partial hemilaminectomy, exploration of the lumbo-sacral space on the left and transplantation of bone, multiple iliac bone grafts to the spine, lumbar 5 to sacral 2, bilaterally." Dr. Svien found a well-developed ridge of bone which was hypertrophic in nature, indicating degenerative changes at the lumbo-sacral joints. These findings were confirmed by the narrowed lumbo-sacral interspace on the X-ray. The operation was performed on the basis of the X-ray and on the subjective complaints of the patient.

During the course of treatment, Mr. Saputo mentioned that he had fallen from a tree in 1963 and ultimately had undergone surgery. He also related that he had had chiropractic and osteopathic treatment in the past and occasionally wore a brace for the past 4 years which really did not help.

Dr. Hirschtick testified that he is a certified orthopedic surgeon and had occasion to examine plaintiff on March 27, 1972. In examining the lower spine, he found that there was a restriction of forward flexion of the spine and a complete loss of extension and that the lateral flexion or bending of the spine involved a loss of 10 degrees in the range of motion. The straight-leg-raising test was positive, indicating that there was some trouble in or around the nerve roots in the area of the lower spine. The doctor also found some atrophy of the left thigh and left calf. The witness stated that these were objective findings and were confirmed by X-rays which indicated that the space between the fifth lumbar and sacrum was markedly narrow.

Dr. Hirschtick was then given a lengthy hypothetical set of facts which included: (1) the previous history of back injury and treatment due to lifting a freezer in 1959, an automobile accident of the same year, and the fall in 1963; (2) the details of the fall on the restroom floor in 1965; (3) the examination and diagnosis of the orthopedic surgeon made 2 days after the 1965 fall; (4) the diagnosis and operation performed by the neurologist and orthopedic surgeon at Mayo Clinic in 1966; (5) and the findings of the orthopedic surgeon who conducted an examination in 1972. Based upon these facts, the doctor stated that in his opinion the condition of the man examined by the orthopedic surgeon in 1972 might or could be related to the injury sustained in November of 1965. The basis of his opinion was that except for the minor episodes in 1959 and 1963, he performed normally as far as his back was concerned until the slip and fall of November 1965. The fall produced a forceful injury to the discs in the lower spine, causing progressive pain in the back which radiated into the legs. The injury required hospitalization. However, the treatment employed, pelvic traction, failed to improve his condition. He then had to go to the Mayo Clinic where they removed the herniated disc and did a spinal fusion at the lumbo-sacral level. Although the witness stated that the diagnosis of the neurologist at Mayo Clinic was consistent with the incident of trauma that occurred on November 28, 1965, he was not allowed to state his opinion on whether the operation performed at Mayo Clinic was causally connected to the 1965 slip and fall. The doctor also gave his opinion that the man's condition would not improve, that he would have pain in the future, and would require medical care and treatment.

Plaintiff's initial contention is that the trial court, in two particulars, prevented the jury from fairly determining the issue of negligence on the part of defendant Fatla. It is first asserted that the court erred in allowing defendant Fatla to testify that he received "Cleanliness Awards" from Shell for the operation of his station. Upon examination of defendant Fatla under section 60, the witness gratuitously stated that Shell held special contests for the cleanliness of its stations. Plaintiff's counsel made no motion to strike the remark. Upon cross-examination, defense counsel, over objection, was allowed to elicit that the witness did very well with respect to the cleanliness program and received several awards for his operation of the station.

It is plaintiff's position that the cross-examination was irrelevant and prejudicial in that its effect was to indicate that defendant had a predisposition to maintain a clean washroom. Defendant maintains that the cross-examination was within the scope of the direct examination, and was thereby properly admitted into evidence.

■■ Fatla's testimony relating to his previous receipt of cleanliness awards was neither competent or relevant to the issue of whether defendant knew or should have known of the condition of the floor on the day in question. Moreover, the fact that on direct examination defendant, in passing, mentioned the existence of "special contests," did not warrant the eliciting of testimony that defendant had received awards therefor. Although we recognize the rule that evidence which is otherwise inadmissible may be presented because similar evidence has been introduced by the adverse party (*People v. Wilbert*, 15 Ill.App.3d 974, 305, N.E.2d 173), it is without application to the instant facts. For the rule is merely protective and goes only as far as is necessary to shield a party from adverse inferences (98 C.J.S. *Witnesses* § 422 (1957)); it does not permit a party to introduce evidence which should not be otherwise admitted merely because the adverse party has brought out some evidence on the same subject. *Herget National Bank v. Johnson*, 21 Ill.App. 3d 1024, 316 N.E.2d 191.

■■ We initially note that defendant's mention of cleanliness awards on direct was gratuitous and unresponsive to the question asked. Although plaintiff did not move to strike the remark, it did not create any adverse inference which would allow further explanation or rebuttal. Consequently, it was error to allow defendant to testify to his receipt of cleanliness awards. We are of the opinion, however, that the error was not of such magnitude to warrant reversal. Error committed in admitting evidence is harmless where the evidence is of small consequence as far as the result is concerned. (*Borowicz v. Seuring Transit Co.*, 98 Ill.App.2d 326, 240 N.E.2d 314.) Here, the issue of negligence involved whether defendant Fatla knew or should have known of the accumulation of water on the washroom floor on the particular day of the occurrence. There was no dispute that the water had in fact accumulated and, more importantly, that such condition was caused by a malfunction of the toilet. It was further undisputed that Fatla had checked the washroom before he had gone home at 1:30 and that the incident alleged occurred shortly after 2 P.M. In the context of the factual issues presented, we think that the receipt of cleanliness awards by defendant Fatla could not have materially affected the decisive issue of whether defendant knew or should have known of the malfunctioning toilet and the resultant condition of the floor.

Plaintiff next contends that the court erred in failing to strike the following statements made by defendant Fatla which were unresponsive to the questions asked by plaintiff:

"Plaintiff's counsel: My question is you just wiped it up and turned it back to the public in that condition, is that right?

Witness: In good condition, yes.

Plaintiff's counsel: Do you have any regular cleaning and maintenance programs?

Witness: It is not a regularly-prescribed program, but all my men are instructed to check the washroom periodically."

■■ Given the nature of the questions asked, we believe that both answers were responsive. (See *People v. Cruise*, 130 Ill.App.2d 923, 266 N.E.2d 109.) Plaintiff further maintains, however, that the witness should be compelled to answer categorically "yes" or "no." We disagree. The trial court is entitled to a certain latitude in ruling upon the form of testimony. (*People v. Dickman*, 117 Ill.App.2d 436, 253 N.E.2d 546.) This is particularly true when the phraseology of a question may not fairly admit of a categorical yes-or-no answer. We find no abuse of discretion when, as here, the answers were competent, relevant, and could reasonably have been expected from the questions propounded.

■■ It is next asserted by plaintiff that the trial court erred in its refusal of plaintiff's Instruction No. 23, taken from IPI 2d—130.03. The instruction reads:

"A landlord who undertakes to make improvements or repairs upon the leased premises is under a duty to use ordinary care in carrying out the work even if the landlord was not under a legal obligation to make the improvements or repairs."

Plaintiff contends that there was sufficient evidence to support the above instruction in that the testimony of defendant Fatla indicated that in July or August of 1965, he called defendant Shell for plumbing repairs. Since there was water on the floor on the day in question, plaintiff concludes that the jury could have found defendant Shell negligent in failing to make proper plumbing repairs. However, as not pointed out by plaintiff, Fatla testified that the repairs related to "some problem with the field, but not with the particular washrooms, anything like that." The instruction in question addresses itself to affirmative conduct, and given the absence of any evidence connecting the "field" repairs with the particular malfunction of the toilet, the refusal of the instruction was proper. *McKasson v. Zimmer Manufacturing Co.*, 12 Ill.App.3d 429, 299 N.E.2d 38.

■■ It is next contended that the court erred in excluding the diagnosis of Dr. Zaricznyj concerning plaintiff's condition on November 30, 1965. Based upon a physical examination and medical history, Dr. Zaricznyj stated his diagnosis as a "very possible herniated disc between L-5 and S-1." Defendant's objection was sustained and the answer stricken. However, the identical testimony was received into evidence during cross-

examination when the witness stated: "My diagnosis was a very possible herniated disc." It is further noted that plaintiff incorporated the above diagnosis in the hypothetical question posed to Dr. Hirschtick. It is generally the rule that a party is not harmed and may not complain of error in the exclusion of evidence when, as here, the same evidence is subsequently admitted. (*Hester v. Goldsbury*, 64 Ill.App.2d 66, 212 N.E.2d 316; *Saviola v. Sears, Roebuck & Co.*, 88 Ill.App.2d 13, 232 N.E.2d 4.) Accordingly, plaintiff suffered no prejudice as a result of the court's ruling.

In regard to medical testimony, plaintiff further contends that the court erred in refusing to allow Dr. Hirschtick to state his expert medical opinion, in response to a hypothetical question, on the causal relationship between the incident of trauma on November 28, 1965, and the operation performed at the Mayo Clinic in January of 1966. The witness was given a lengthy and detailed hypothetical set of facts which incorporated the witness' testimony of his examination of plaintiff in 1972. Based upon these facts, the witness stated that the condition of the hypothetical man when examined in April of 1972 by the orthopedic surgeon could be related to the injury sustained in November of 1965, and that the hypothetical person could have pain in the future and could require medical care. The doctor was then asked whether the operation performed in 1966 was causally connected to the alleged trauma of November 28, 1965. Defendants' objection to the question was sustained.

Defendants argue that the hypothetical question was improper in that the witness would have no way of knowing anything about an operation performed by others, and consequently, any answer by the witness would be pure guess and speculation.

■■ In stating his opinion as to the CAUSAL relationship between two events or conditions, personal observation by the expert is no prerequisite to a hypothetical presentation. (*Sherman v. City of Springfield*, 77 Ill.App.2d 195, 222 N.E.2d 62.) Furthermore, a hypothetical question is not objectionable because it incorporates the diagnosis of another doctor. (*Horwitz v. Michael Reese Hospital*, 5 Ill.App.3d 508, 284 N.E. 2d 4.) Here, the hypothetical set of facts included the diagnosis of the operating physician, what the operation consisted of, and when it was given, as well as the patient's prior history of back trouble. Although we hold that there existed a sufficient foundation in the evidence to support the facts assumed in the hypothetical, and that the witness should have been allowed to state his opinion as to the causal connection between the incident of November 28, 1965, and the operation in 1966, the trial court's ruling did not constitute reversible error.

The witness, in concluding that the condition of the hypothetical man

in 1972 could be causally related to the occurrence of November 28, 1965, stated that he based his conclusion, in part, upon the diagnosis rendered and operation performed at Mayo Clinic in 1966. He further stated that the 1966 diagnosis was consistent with the 1965 slip and fall. It was necessarily implied in the reasoning of the witness that the 1966 operation was causally connected to the incident of November 28, 1965. Therefore, the explicit statement by the witness of the causal relationship between the two events would have added little, if anything, to the testimony of the witness. We further note that in the context of the ultimate opinion stated by the witness—that the condition of ill being could be related to the 1965 fall—the causal connection between the operation and the fall can fairly be said to relate to the issue of damages, not liability. In view of the verdict of not guilty, it must be presumed that the jury did not reach the issue of damages, and consequently, the error was not reversible. *Kortlander v. Chicago Transit Authority*, 56 Ill. App.2d 48, 205 N.E.2d 516.

Plaintiff further alleges that the court erred in striking plaintiff's answer to a question propounded by plaintiff's counsel:

> "Counsel for Plaintiff: Did you make any specific complaint of injury at that time?
>
> Witness: No.
>
> Counsel for Plaintiff: Did you—
>
> Witness: I just wanted to get out of there. Get home."

On defendants' objection the answer was stricken on the grounds that it was a volunteered statement. Plaintiff asserts that the trial court erred in sustaining the objection, because only the examiner has the right to object to the answer as being unresponsive. (*Hester v. Goldsbury*, 64 Ill. App.2d 66, 212 N.E.2d 316.) Defendants contend that the statement was not given to a question and therefore there is no issue as to whether it is responsive and who has a right to object to it. (98 C.J.S. *Witnesses* §§ 325, 356 (1957).) The trial judge apparently viewed the statement as a volunteered remark made in the absence of a pending question. We find no error in his characterization of the statement (See *Felton v. Coyle*, 95 Ill.App.2d 202, 238 N.E.2d 191), and further note that in light of the witness' subsequent identical testimony, plaintiff has failed to demonstrate any prejudice resulting from the ruling. *Hester v. Goldsbury*, *supra*.

It is further assigned as error that defendants were allowed to cross-examine and impeach plaintiff with reference to statements concerning unconnected prior injuries. The argument is without merit.

During direct examination, plaintiff testified that in 1959 he "popped" his back while helping a friend move a freezer and that in 1963 he fell

from a ladder while trimming a tree and injured his lower back and neck. On cross-examination plaintiff also admitted that in 1959 he was hit by a snowplow and sustained injuries to the low back. The witness stated that he did not receive treatment for the injuries from a Dr. Lafata, but that the latter merely took X-rays and "couldn't find anything." Defense counsel was then allowed to impeach plaintiff by the witness' deposition wherein he stated that he had been treated by Dr. Lafata for a "few weeks." In response to a question whether he had injured his back in the 1959 automobile accident, the witness stated that "[i]t was mostly my thigh and my leg." The witness was then asked whether he recalled answering written interrogatories concerning the injury. Plaintiff responded: "No specific main injury. You have an accident, sometimes you just hurt all over." Defense counsel, at this point, read an answer to the pertinent interrogatory which stated: "Auto accident, 1959, low back injured." There was no reference to any injury other than the low back.

■■ Generally, a plaintiff may be cross-examined as to his previous physical condition or injuries when they are of a nature similar to those involved in the immediate litigation. (*Palsir v. McCorkle*, 70 Ill.App.2d 425, 216 N.E.2d 682.) Such examination is proper for either showing that his present physical condition is not the result of the occurrence for which the immediate suit was brought, but was caused, in whole or part, by an earlier injury or pre-existing condition (*Palsir v. McCorkle, supra*), or for the purpose of discrediting the plaintiff as a witness or laying a foundation for impeachment. *Springfield v. City of Granite City*, 157 Ill.App. 61; *Gordon v. Checker Taxi Co.*, 334 Ill.App. 313, 79 N.E.2d 632.

■■ Plaintiff correctly maintains that cross-examination of the plaintiff as to previous injuries not related to the one sued on is improper. (*Marut v. Costello*, 34 Ill.2d 125, 214 N.E.2d 768.) However, all of the previous injuries sustained by plaintiff involved the lower back; they were of a nature similar to the injury of the instant suit and were proper subjects for consideration by the jury in their deliberations. (*Geaschel v. Rokita*, 89 Ill.App.2d 161, 232 N.E.2d 204; *Palsir v. McCorkle, supra*.) Moreover, plaintiff, having injected the fact of previous injuries into the case, can not complain of defendants' inquiry into the matter on cross-examination. (See *Palsir v. McCorkle, supra*.) Since the fact of prior injuries was both material and probative, it follows that the impeachment thereon was proper as well. See *Gordon v. Checker Taxi Co., supra*.

Plaintiff further contends that the court erred in allowing defense counsel, during closing argument, to speculate on facts not in evidence. After discussing the evidence, defense counsel argued that, based upon

circumstantial evidence, it was "very questionable whether [plaintiff] ever fell the way he says he did." Defense counsel argued that it was just as reasonable to believe that plaintiff had injured his back while working at the convention he attended that weekend.

▮▮▮▮ In arguing a case to the jury, counsel is allowed broad latitude in drawing reasonable inferences and conclusion from the evidence (*Johnson v. Chicago Transit Authority*, 11 Ill.App.3d 16, 295 N.E.2d 573), and may further comment, within reasonable limits, on those who give evidence. The scope of permissible argument is within the sound discretion of the trial court. (*Jackson v. Whittinghill*, 39 Ill.App.2d 315, 188 N.E.2d 337.) In determining whether the court has abused its discretion, we are guided by the following language in *Reinmueller v. Chicago Motor Coach Co.*, 341 Ill.App. 178, 186, 93 N.E.2d 120, 124:

> "Several of the statements denounced are inferences which plaintiff's counsel was entitled to deduce from the evidence. Wide latitude should be allowed in this regard. If the rule with reference to improper inferences were applied as strictly as counsel for defendants urge, it would have a tendency to deprive litigants of the right of having their cases argued, for the prudent attorney would in such case forego argument rather than risk reversible error. In *Commonwealth Elec. Co. v. Rose*, 214 Ill. 545, the court said at page 561:
>
> 'Counsel may arraign the conduct of the parties, and impugn, excuse, justify, or condemn motives, so far as they are developed in evidence, or assail the credibility of witnesses when it is impeached by direct evidence, or by inconsistency, or incoherency of their testimony, their manner of testifying, their appearance upon the stand, or by circumstances. "He may argue such conclusions from the testimony as he pleases, provided he does not misquote witnesses." . . . It has been said: "Just and fierce invective, when based upon the facts in evidence and all legitimate inferences therefrom, is not discountenanced by the courts."
> * * *'"

As applied to the instant case, we find no abuse of discretion in allowing the argument. The thrust of this portion of the argument was that either plaintiff did not fall or, if he did, he fell at some other place. The evidentiary basis for the inference was the testimony that he made no complaint to defendants' employees of the alleged fall or injury, and that his clothes were not wet. We feel that the latitude of expression allowed defense counsel did not prevent plaintiff from receiving a fair trial.

Plaintiff's final argument is that the court erred in allowing defen-

dants to make reference to a "lien letter" from plaintiff's attorney. We must disagree with plaintiff's unwarranted characterization and assessment of the pertinent testimony. There was no mention of any "lien" and the sender was described in the disjunctive as either "Mr. Saputo or his attorney." We hold the contention to be without merit.

■■ As earlier noted, plaintiff does not contend that the verdict was against the manifest weight of the evidence, but argues that the cumulative effect of the alleged errors warrants reversal and remandment. However, where it is not contended that the verdict was not supported by the manifest weight of the evidence, the verdict will not be disturbed for contentions of a nonprejudicial nature. (*Hann v. Milla*, 95 Ill.App.2d 447, 237 N.E.2d 753.) For the object of review by this court is not to determine whether the record is completely free of error, but whether any error occurred which operated to the prejudice of appellant or unduly affected the outcome below. (*Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 199 N.E.2d 769.) We have carefully examined the record in this regard, and hold that the errors committed, either individually or collectively, do not require a new trial.

Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.

DOWNING, P. J., and HAYES, J., concur.